No. 55,296

STATE OF KANSAS, *Appellee*, v. JAMES EUGENE TAYLOR, *Appellant*.

(673 P.2d 1140)

Opinion filed December 2, 1983.

*Dan D. Boyer,* of Sweet & Boyer, of Salina, argued the cause and was on the brief for the appellant.

*Mickey W. Mosier,* assistant county attorney, argued the cause, and *Robert T. Stephan,* attorney general, was with him on the brief for the appellee.

The opinion of the court was delivered by

LOCKETT, J.: This is a direct appeal from a jury verdict wherein the defendant was found guilty of first-degree murder of his wife in violation of K.S.A. 21-3401.

James E. Taylor, the defendant, testified that on Friday, May 28, 1982, he and his wife, Shirley Ann Taylor, drove in the defendant's automobile from Salina to the Brookville Hotel, Brookville, Kansas, for dinner. The Taylors entered the Brookville Hotel at approximately 7:30 p.m., ate dinner and departed around 8:30 p.m. The Taylors returned to the location in Salina where Mrs. Taylor had parked her car prior to dinner. After departing the defendant's automobile, Mrs. Taylor planned to shop prior to meeting someone, and then go camping over the week-end. Defendant returned to the Salina residence. The

defendant left the residence later, drove around town, purchased some gasoline at a convenience store, and then returned to the residence where he worked on his automobile. Mr. Taylor was seen by a friend and the clerk at the convenience store during this period of time. At approximately midnight the defendant drove to Topeka where he was to work the next day.

Mr. Taylor was unable to contact his wife in Salina by phone from Topeka. During the week-end the defendant phoned family and friends in search of his wife. Saturday, May 29, 1982, the defendant returned to Salina where he attempted to locate his wife.

On May 31, 1982, the defendant phoned the Salina Police Department to report his wife had been missing for several days. Defendant stated he and his wife had dined at the Brookville Hotel Friday evening. He had last seen her when he dropped her off at her car in Salina at approximately 9:00 p.m.

The next day the defendant phoned the Salina Police Department to see if any progress had been made in locating the missing wife. Det. Galen Marble talked to the defendant at this time. That evening Det. Marble, while enroute to the defendant's residence to obtain more information, discovered Shirley Taylor's automobile parked on a Salina street. Det. Marble contacted the defendant at his home, obtaining additional information to complete the missing person's report. Det. Marble then told the defendant he had located the wife's car in Salina. In separate cars, Marble and the defendant drove to the location where Mrs. Taylor's automobile had been found. The defendant told Det. Marble that the car had originally been parked in a different location when he last saw his wife Friday night.

On June 2, 1982, the defendant was requested to come to the police station. From 12:10 p.m. to 5:45 p.m. the defendant was questioned about his wife's disappearance in three separate sessions. During the last session, the defendant was informed of his *Miranda* rights prior to questioning. Defendant returned home that night. On June 3, 1982, the defendant was again requested to return to the police department. Defendant was warned of his *Miranda* rights and questioned by a different group of officers.

On June 4, 1982, Shirley Taylor's bullet-riddled body was discovered in a ditch two miles northwest of Brookville, Kansas,

by a Saline County highway department employee. The body was covered by grass native to the area. The defendant was formally arrested June 4, 1982, after the discovery of the body. During investigation after the defendant's arrest, searches were conducted of the scene, defendant's automobile, the Taylor residence, a cabin at the Scott County Lake, and the defendant's motel room in Topeka where his clothing was seized. Nothing of evidentiary value was recovered at the scene. Neither the victim's purse nor the murder weapon were ever found.

An autopsy conducted later on the body revealed Shirley Taylor's death was caused by three gunshot wounds to the head and throat region which produced massive brain injury. A fourth shot grazed the right side of the victim's neck. From the contents of her stomach, the pathologist determined Shirley Taylor died from one to two hours after ingestion of her meal at the Brookville Hotel.

At the trial, a K.B.I. firearms expert testified that a bullet recovered from the body was a .22 caliber. The defendant had previously told the police he had owned a .22 caliber pistol but had sold it six weeks prior to June 3, 1982, to an unknown Mexican male in the parking lot of a Garden City discount store. The victim's brother-in-law testified he had seen the gun at the Scott County Lake cabin on May 22, 1982. Defendant testified he was in error as to the date of the sale; the gun was actually sold about one week prior to the wife's death to the unknown Mexican male.

Evidence was introduced that the Taylors were having marital problems. Mrs. Taylor was contemplating obtaining a divorce from the defendant. Two notebooks, one prepared by each of the Taylors at a prior marriage encounter session, were admitted into evidence over the defendant's objection.

The jury found the defendant guilty of murder in the first degree; he appeals this conviction.

Prior to trial, defendant moved for a change of venue. On August 20, 1982, a pretrial hearing was held. Defendant called as witnesses representatives of two local radio stations, one local television station, and a newspaper of general circulation in the Saline County area. Copies of press coverage of the events were introduced into evidence by the defendant. In addition, the defendant submitted eighteen affidavits from citizens living in

Saline County, all expressing the opinion it would be impossible for the defendant to receive a fair and impartial trial in Saline County. Each affidavit submitted was a copy reproduced from one original with blanks for the date and signature of the person signing.

When a change of venue is requested it is incumbent upon the defendant to satisfy the court there exists in the county where the trial is scheduled a prejudice so great against the defendant that he cannot receive a fair and impartial trial in that county. K.S.A. 22-2616(1). The defendant must show prejudice exists in the community, not by speculation, but as a demonstrable reality. *State v. Shaffer*, 229 Kan. 310, 624 P.2d 440 (1981). The State is not required to produce evidence to refute affidavits obtained by the defendant. *State v. Sanders*, 223 Kan. 273, 574 P.2d 559 (1977).

We have reviewed the newspaper clippings and copies of the radio and TV news releases submitted by the defendant to the trial court. The stories are factual representations of each newsworthy occurrence from the report of a missing person, and the finding of a body, to the arrest and sentencing of the defendant after trial. The defendant has been unable to demonstrate anything other than objective and factual reporting by the press.

The defendant does establish that there was extensive coverage by the media in the local area of each event as it occurred. The publication of articles in a local newspaper and coverage by local radio or TV do not per se establish prejudice. Mass media coverage and the dissemination of the news is a reality. We accept the fact that informed jurors are aware of newsworthy events that occur locally, nationally and world-wide. The law does not require disqualification of an informed juror who is able to give the defendant a fair and impartial trial.

It has long been the law of Kansas that a change of venue in a criminal case lies within the sound discretion of the trial court. When the jury was selected in this case, not one juror was disqualified for cause. There has been no showing there existed such prejudice that the defendant was denied a fair trial. The trial court's refusal to grant a change of venue is supported by competent evidence and there has been no showing of prejudice to the substantial rights of the defendant.

Defendant contends that statements made to police officers on

June 1 through June 3, 1982, were not admissible. Defendant claims he was not advised of his right to remain silent until the afternoon of June 2, 1982, and as a result, information gained prior to the *Miranda* warnings is inadmissible. He also argues evidence acquired after the *Miranda* warnings as a result of pre-*Miranda* statements is inadmissible as "fruit of the poisonous tree."

On May 31, 1982, defendant contacted the Salina police to report his wife missing. On June 1, 1982, Det. Marble contacted defendant at his Salina home to complete the missing person report. After Marble obtained the information, he informed the defendant that the wife's car had been located. On June 2, 1982, defendant was requested by Marble to come to the police station. From 12:10 p.m. until 5:45 p.m. the defendant was questioned three separate times. It was at the last questioning June 2, 1982, that defendant was first informed of his right to remain silent. On June 3, 1982, about 4:00 p.m., at the request of the police, defendant returned to the police station, was warned of his rights and again questioned by authorities. During the different interviews with the defendant, as new information developed, the defendant was questioned by the police about that information.

Though the sequence of events is clear, we are unable to determine from the record what statements the defendant made during a particular session and what information was developed from that statement. Prior to the discovery of the wife's body, the police obtained from the defendant information needed to assist in locating Mrs. Taylor, to discover if the reason for Mrs. Taylor's disappearance was due to marital problems or foul play.

This court has recognized the distinction, drawn in *Miranda*, between custodial interrogation and investigatory interrogation. By custodial interrogation is meant the questioning of persons by law enforcement officers which is initiated and conducted while such persons are held in legal custody or are otherwise deprived of their freedom of action in any significant way. Investigatory interrogation means the questioning of persons by law enforcement officers in a routine manner in an investigation which has not reached an accusatory stage and where such persons are not in legal custody or deprived of their freedom of action in any significant way. *State v. Price*, 233 Kan. 706, 712, 664 P.2d 869 (1983).

When the defendant reported his wife as missing, he set in motion the fact-finding process and efforts by the authorities to locate the wife. When the authorities sought additional information about the missing person, the questioning occurred at the defendant's home or at the Salina Police Department. Whenever questioning occurred outside the defendant's home, the defendant drove his own automobile or rode in a friend's automobile to the area where the questioning occurred. After each questioning session, the defendant was allowed to leave without restraints on his movement. As officers became suspicious of foul play, the defendant was warned of his constitutional rights under *Miranda.* In an effort to hide the death of the wife or assist in a genuine effort to locate the missing wife, Mr. Taylor cooperated with the officers and supplied the requested information.

Law enforcement officers routinely investigate missing person reports. The officers, in performing their duty, obtain information necessary to locate the missing person. In performing the investigation, police officers must obtain necessary information from individuals not under restraint. Questioning to determine the reason for a person to be missing, in an effort to locate the missing person, is a fact-finding process not affected by *Miranda.* Under the facts of this case, the defendant's constitutional rights were not violated.

Defendant claims that the introduction into evidence of a notebook containing statements written by the deceased wife was error. During the week-end of April 24 and 25, 1982, the defendant and his wife attended a marriage encounter session in Kansas City. The Taylors were required to keep a notebook at the session, and write letters to each other during the encounter week-end. The police officers obtained the notebooks while searching the Taylor residence June 6, 1982.

Prior to the discovery of his wife's body, the defendant had admitted that there were problems with the marriage relationship. Defendant claimed that his wife had determined not to seek a divorce and the marriage problems had been reduced to a point that the marriage was no longer floundering. The wife's notebook contradicted the picture painted by the defendant. The wife wrote in her notebook she attended the encounter sessions to help prepare the defendant for divorce. Shirley Taylor wrote of feelings of love and affection for the defendant, but that the

relationship of marriage was no longer possible for them. Contained in a letter to her husband was a statement of her fear of the defendant's temper. The wife wrote:

"One of the things I did not tell you that I am not open about you is your temper or anger. Not only do I not know how to relate to your outbursts, I must admit quite frankly that you intimidate me when you are angry, & sometimes you just scare me to distraction. I know quite rationally that your 'tantrums' are not directed at or caused by me. However, when these situations occur, I freak out. I feel panicky, sad, unable to cope, ashamed, and very insecure at these times."

The State offered both of the Taylors' notebooks at the close of its case-in-chief with all other exhibits. Defendant objected to the admission of Shirley Taylor's notebook into evidence on the grounds of relevancy, materiality, remoteness and hearsay. The court deferred ruling on the admissibility of the notebook until the conclusion of the trial. Defendant admits that his notebook was properly used to impeach him when cross-examined by the State.

Evidence of prior acts between a defendant and a victim are admissible independent of K.S.A. 60-455 if the evidence is to establish the relationship between the parties, the existence of a continuing course of conduct between the parties, or to corroborate the testimony of the complaining witness as to the act charged. Cases have allowed prior conduct to be admitted into evidence where a family relationship existed. In *State v. Crossman,* 229 Kan. 384, 624 P.2d 461 (1981), Crossman, the victim's stepfather, was convicted of two counts of indecent liberties with a child and one count of aggravated sodomy. The trial court allowed testimony of other instances of sexual misconduct between the defendant and the child to establish the relationship of the parties and the existence of a continuing course of conduct between the parties. In *State v. Phipps,* 224 Kan. 158, 578 P.2d 709 (1978), Phipps was convicted of first-degree murder when he beat to death his father-in-law. The victim's sister was allowed to testify that the deceased had stated the defendant was running his family life and he disapproved. In *State v. Fenton,* 228 Kan. 658, 620 P.2d 813 (1980), Fenton was convicted of first-degree murder after shooting his wife which resulted in her death. A Mrs. Blunk testified she had heard the defendant threaten to kill his wife ten months earlier. In *State v. Wood,* 230 Kan. 477, 638 P.2d 908 (1982), Wood was convicted of second-degree murder after shooting his wife with a shotgun. The wife's mother was

allowed to testify of conversations where the victim stated the defendant had beaten her and expressed fear that the defendant would kill her. Edward Ketner testified four months prior to the killing he saw the defendant throw his wife down and drag her through the living room while holding a loaded .22 caliber gun. Ketner also testified the defendant, at a prior time, stated "he would blow his old lady's head off." In *State v. Green*, 232 Kan. 116, 652 P.2d 697 (1982), Green was convicted of first-degree murder of his wife. Evidence of marital discord in the weeks preceding the victim's death was present, including an incident where Green had threatened to send his wife "back to Africa in a pine box." Neighbors testified that the victim was afraid of Green. In *State v. Knapp*, 234 Kan. 170, 671 P.2d 520 (1983), Knapp was convicted of stabbing his ex-wife and shooting a neighbor woman. The court admitted into evidence portions of his deceased ex-wife's prior testimony from the divorce trial of an earlier break-in at the victim's residence.

The statements in the notebook were not inadmissible hearsay because they were not introduced to prove the truth of the matters stated, such as whether the defendant had a bad temper. K.S.A. 60-460. The significance of the statements lies in the fact that they were made. *State v. James*, 223 Kan. 107, 108-09, 574 P.2d 181 (1977). They show Mrs. Taylor believed the marriage had problems, that there was indeed marital discord. *State v. Phipps*, 224 Kan. 158.

The rule in Kansas is that in a case of marital homicide, evidence of a discordant marital relationship and a wife's fear of her husband's temper is competent as bearing on the defendant's motive and intent. The court did not err in admitting into evidence Shirley Taylor's letters which contained statements of marital discord and her fear of the defendant's temper since they showed the relationship of the parties and their conduct in that relationship.

The defendant finally contends that there was insufficient evidence to convict him of first-degree murder.

There is little, if any, doubt that Shirley Taylor was murdered. Three bullets were shot into her head. The only question is the identity of the murderer. The evidence presented against the defendant established that Shirley Taylor's body was found two miles from the Brookville Hotel where the Taylors had eaten

dinner earlier in the evening. The food in Shirley Taylor's stomach was eaten one to two hours before she died, and was the same food eaten at the Brookville Hotel. The defendant was not seen for several hours after the Brookville dinner. One of the bullets in the body was a .22 caliber. A .22 caliber revolver had been seen at the defendant's cabin six days before the murder, a fact about which the defendant had initially lied. The Taylors were experiencing marital problems. The defendant did not want the divorce his wife desired. Taylor suspected his wife of having an extramarital affair and exhibited signs of jealousy by hiding in a closet and planting an electronic bugging device in their bedroom.

The defendant claims since the conviction is based on circumstantial evidence, the circumstantial evidence must be so strong as to exclude every reasonable hypothesis except that of guilt of the defendant. *State v. Ragland,* 170 Kan. 346, 226 P.2d 251 (1951). It is the prerogative of the jury to determine the credibility of witnesses, the weight to be given the evidence, and the reasonable inferences of fact which may be drawn from the evidence; a trial judge in passing on a motion of acquittal should consider the evidence, keeping in mind the prerogative of the jury, and if he should conclude a reasonable mind might fairly decide a defendant guilty beyond a reasonable doubt of the crime charged, he must submit the case to the jury. *State v. Wilson & Wentworth,* 221 Kan. 359, 559 P.2d 374 (1977). When considering the sufficiency of circumstantial evidence to sustain a conviction of a crime on appeal, the question is not whether the evidence is incompatible with any reasonable hypothesis except guilt. That question was for the jury and the trial court. In a criminal action where the defendant contends the evidence at trial was insufficient to sustain a conviction, the standard of review on appeal is: Does the evidence when viewed in the light most favorable to the prosecution convince the appellate court that a rational factfinder could have found the defendant guilty beyond a reasonable doubt? *State v. Voiles,* 226 Kan. 469, 601 P.2d 1121 (1979).

The trial court was justified in overruling the defendant's motion for judgment of acquittal because a reasonable mind might fairly decide the defendant was guilty beyond a reasonable doubt of the crime charged.

The judgment is affirmed.