No. 84,258

STATE OF KANSAS, *Appellee*, v. GREGORY D. LESSLEY, *Appellant*.

(26 P.3d 620)

Opinion filed July 13, 2001.

*Richard Ney*, of Law Offices of Richard Ney, of Wichita, argued the cause and was on the briefs for appellant.

*Debra S. Peterson*, assistant district attorney, argued the cause, and *Charles R. Reimer*, assistant district attorney, *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by defendant Gregory D. Lessley from his conviction by a jury of one count of premeditated first-degree murder and one count of aggravated assault. The trial court imposed a hard 40 sentence plus 13 months' imprisonment. Defendant appeals his conviction and sentence. He raises six issues on appeal.

Lisa Sears died on January 6, 1999, from multiple gunshot wounds to her abdomen. The autopsy showed that she had been struck by five bullets. Defendant admitted that he shot Lisa, but claimed that he intended to kill himself rather than her.

Lisa lived with her sister, Michelle, in the Windemere Apartments complex in Wichita. Lisa was an intensive care nurse at Via Christi-St. Francis. Defendant lived in the same apartment complex in a different building. He and Lisa dated for about 2 years until she told him around the holidays in 1998 that she did not want to see him, at least for awhile.

On January 4, 1999, defendant went to Lisa's workplace with a bouquet of flowers. He demanded to know whom she had been dating. Lisa denied dating anyone and told him to leave because it was inappropriate for him to be there. She told him she would telephone him when she got home, which she did. Michelle overheard Lisa talking to him in a louder-than-usual voice and dominating the conversation, which also was unusual. Lisa told defendant that their relationship was over.

Defendant was very depressed, he did not sleep, and he began to think of suicide. The next morning he approached a Boeing co-worker about buying a gun. He went to his credit union and withdrew $850. He gave his brother, who had asked for a loan, $300 and $550 was for the gun.

The evening of January 5, defendant telephoned his mother, who lived in Derby. He was very depressed and spoke of suicide. According to defendant's mother, though, after they had talked he told her, "I'm going to be all right, I'm okay." Defendant testified

that after talking with his mother he paid his bills, wrote a suicide note, and wrote out instructions for care and disposition of his property.

The morning of January 6, defendant dressed and went to Boeing, where he met his co-worker in the parking lot and exchanged money for the gun. The gun, a Kimber .45 automatic, was loaded when he bought it. Instead of going in to work, defendant returned to the apartment complex. It was approximately 6:30 a.m. Defendant saw Lisa's car in the parking lot.

Defendant went to his apartment and familiarized himself with the gun. He pulled the slide back and put a round into the barrel, but did not shoot himself. Defendant testified that he wanted to see Lisa to assure her that it was not her fault that he was going to kill himself.

At approximately 8 a.m., defendant went outside. He waited outside Lisa's building for 15 to 20 minutes. When she did not appear, defendant went back to his apartment and waited until approximately 9 a.m. Defendant went back to Lisa's building, where he saw an acquaintance and told her he was waiting for his brother. He waited near Lisa's building for approximately 10 minutes before going back to his apartment, where he spotted Lisa from his balcony. She was walking her dog. With the gun in his pocket, defendant went out to see her.

Defendant testified that they had talked for approximately 20 minutes before he told her he was going to kill himself. He showed her the gun to impress on her that he was serious. Lisa tried to convince him to get in the car with her so that she could take him to a counselor. He refused.

While Lisa urged him to get rid of the gun, Sarah and Darrell Blackman, who were residents of the apartment complex, drove toward defendant and Lisa. Lisa went out into the street into the path of the Blackman car and raised her hands. She asked them not to drive on by. According to Darrell, Lisa was "[t]errorized, very frightened, scared to death." Sarah rolled down the window on the passenger side of their vehicle. Clutching her little dog, Lisa pleaded with them not to drive away. Defendant took out the gun so that Sarah could see it and told them to keep driving. Sarah

testified that defendant was very calm, very determined, and so extraordinarily focused on Lisa that he really did not pay much attention to the Blackmans.

After seeing the gun, Sarah told Darrell to drive on. They drove quickly to the nearest house where they saw a man in his yard with a cellular telephone. Sarah jumped from the vehicle and ran to him. As the man with the telephone was dialing for help, they heard two gunshots. The 911 call was received by the dispatcher at 10:15 a.m. When the Blackmans returned to where Lisa had stopped them, Lisa was lying on the grass. Sarah saw defendant's back as he went around a corner.

Stan Madden, the maintenance man for the apartment complex, was on his golf cart when he heard shots. He drove in the direction of the sound and saw a man standing over a woman. As Madden approached, the man knelt down. Defendant denied to Madden that anything was wrong and then ran away. Madden saw that Lisa was bleeding and in pain. When Lisa raised her head and asked Madden for help, he knelt down, cradled her, and put a coat over her. At the sentencing hearing, Madden testified:

"She was bleeding real bad. She just said—she told me she didn't want to die. I just told her to hang on. She told me she was real cold and we covered her up and she—she told me that she loved her mom and her sister. Then she just—she kept saying she was very cold and she didn't want to die."

Madden stayed with Lisa until the police and an ambulance arrived. Sometime later, defendant returned with his hands up and told police, "I did it."

Defendant testified that he raised the gun to kill himself, rather than Lisa, but got dizzy and disoriented. He denied ever wanting to harm Lisa. He testified that when he fired the gun it did not seem real. Defendant felt like he was watching it happen, and it did not seem to him that he was a part of it.

Defendant told the jury that he went back to his apartment to kill himself, but the gun was empty. He tried to load it, did it wrong, and jammed the gun. As he worked to get the misloaded bullet out of the gun, he heard a commotion outside. He testified that looking out and seeing the vehicles and Lisa on the ground made him realize "it was all real." He went outside and surrendered to police.

Defendant described his mental state at the time he shot Lisa as like having a petit mal seizure. He testified that he had a concussion as a small child, which resulted in his having grand mal seizures until he was in his teens. His mother testified that he took medicine to control grand mal seizures from age 18 months to 30 years. Defendant was 41 years of age at the time of trial. After the grand mal seizures ceased, he occasionally had petit mal seizures, which lasted from 1 or 2 seconds to 20 seconds. During the petit mal seizures, he might shake slightly, become disoriented, or be dizzy.

Defendant had suffered periods of depression throughout his life. In 1993, when he and his former wife had separated, he attempted suicide by taking an overdose of acetaminophen, then regretted his action and went to his neighbor's house for help.

Dr. Marilyn Hutchinson, a psychologist who testified on defendant's behalf, believed that defendant's depression on January 6 diminished his ability to plan and diminished his ability to think about anything other than suicide. She identified defendant's sensation of being outside the action and watching Lisa be shot as a psychological defense to overwhelming emotion, which is called disassociation. She testified that she found nothing in her testing and evaluation of defendant, which began March 18, 1999, to indicate that he was angry or resentful at the time he shot Lisa. She concluded that defendant's depression and his obsession with suicide compromised his ability to form intent that would relate to anyone other than himself.

The State's expert witness, William Levine, identified defendant's sensation of being outside the action as depersonalization. He described it as a fairly common psychological experience seen in people with and without mental illness. He testified that it would have nothing to do with a person's ability to form intent because it is nothing more than a perceptual distortion. Further, with regard to intent, Levine testified that he found nothing in the records or from his examination of defendant that would indicate that defendant, because of mental disease or defect, lacked the ability to formulate the intent to kill Lisa or to premeditate her death. Levine also testified that all voluntary muscle movement halts during a

petit mal seizure, which in more current terminology is an absence seizure. Thus, a person having an absence seizure would not be capable of squeezing the trigger to fire a gun. A person having an absence seizure, for example, will stop in mid-sentence and in a moment resume right where he or she left off. It is a very brief loss of consciousness which the person having the seizure is not aware of at the time and has no memory of afterward.

Levine believed that defendant's thoughts and plans of suicide were genuine and stated: "I believe he intended to kill himself. I don't think he always intended to kill Lisa Sears. I think that idea occurred to him pretty suddenly . . . when he got angry." Levine explained that his belief that defendant was angry was based on defendant's committing the angry act of shooting Lisa as well as on what the Blackmans observed.

## I. SUFFICIENCY OF THE EVIDENCE

When the sufficiency of the evidence is challenged, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Mincey*, 265 Kan. 257, 268, 963 P.2d 403 (1998). In the present case, defendant contends that there was insufficient evidence that he killed Lisa deliberately or with premeditation. The Kansas Legislature eliminated the word "deliberately" from the first-degree murder statute, K.S.A. 21-3401, several years before this case arose. See L. 1992, ch. 298, § 3. Defendant contends that the weight of the evidence is not on the side of premeditation, but as we have seen that is not the standard by which this court reviews evidence that has been challenged as insufficient.

To the exclusion of evidence of the events that led up to defendant's shooting Lisa, his argument is based almost entirely on the psychological evidence. He leans heavily on Levine's believing that the idea of killing Lisa occurred to defendant rather suddenly, and he expends quite a lot of effort in trying to refute Levine's belief that defendant was angry. Defendant's argument fails to take into account that the psychological testimony was provided to guide

the jurors in their evaluation of the evidence of defendant's conduct.

The State responds with a catalog of evidence of defendant's conduct from which the jury could have inferred that defendant planned to kill Lisa. That evidence includes his buying a gun immediately after Lisa broke off their relationship. The evidence of defendant's conduct the morning before the murder includes his stalking behavior, his preventing Lisa from getting help from the Blackmans, and the lack of provocation. Defendant's explanation for seeing Lisa before he killed himself was that he wanted to assure her that his committing suicide was not her fault, which the jury might well have discounted in light of evidence that he wrote a suicide note in which he could have communicated that assurance and that he carried the gun with him as he sought out Lisa. Defendant's explanation for his shooting Lisa—he had a seizure at the moment he raised the gun to kill himself and Lisa was in the path of the bullets—also may well have been discounted by the jury. The evidence of defendant's conduct after the murder includes his continuing to fire at Lisa after she had been hit and fallen to the ground and his failing to aid her or obtain medical assistance for her once he shot her.

The evidence noted by the State is quite sufficient to support a rational factfinder's determining beyond a reasonable doubt that defendant thought beforehand about killing Lisa and that he came to the conclusion that he would kill her and then did so. There is a possibility that the psychological testimony defendant focuses on might modify a rational factfinder's view of the evidence of defendant's conduct, but by no means would it necessarily affect a rational factfinder's view that defendant was guilty beyond a reasonable doubt.

As a fallback, defendant argues that the State's circumstantial evidence of premeditation improperly relies on compound circumstantial inferences. In other words, defendant contends that premeditation could only be found by the jury's drawing inferences based on inferences. To the contrary, there was evidence of defendant's conduct from which the jury could have inferred directly that he premeditated the killing. Defendant testified that he ar-

ranged to purchase a gun the day after Lisa broke off their relationship and that he waited and watched for Lisa on the morning he shot her, the Blackmans testified that defendant prevented Lisa from getting help from them, and defendant denied that there was provocation for his shooting Lisa.

Also, with regard to circumstantial evidence, defendant cites a standard employed by the Florida Supreme Court. In *Fisher v. State*, 715 So. 2d 950, 952 (Fla. 1998), that court reversed the first-degree murder conviction of a man who had been sentenced to death. Reversal was on the ground that the State's proof did not exclude every reasonable hypothesis that the homicide occurred other than by premeditated design. The principles by which the Florida court measured the evidence are as follows:

"Premeditation is more than a mere intent to kill; it is a fully formed purpose to kill. [Citation omitted.] Premeditation may be proved by circumstantial evidence. [Citation omitted.] However, premeditation sought to be proved by circumstantial evidence must be inconsistent with every other reasonable inference. [Citation omitted.] If the State's proof fails to exclude a reasonable hypothesis that the homicide occurred other than by premeditated design, a verdict of first-degree murder cannot be sustained." 715 So. 2d at 952.

In *State v. Wilkins*, 215 Kan. 145, 156, 523 P.2d 728 (1974), this court overruled case law requiring an instruction that paralleled the Florida court's principles:

"We hold an instruction on circumstantial evidence, which cautions the jury that a defendant should not be found guilty unless the facts and circumstances proved exclude every reasonable theory of innocence or states that the jury cannot convict the defendant on circumstantial evidence unless the circumstances exclude every reasonable hypothesis of his innocence, is unnecessary when a proper instruction on 'reasonable doubt' is given; and we overrule *State v. White*, 211 Kan. 862, 508 P.2d 842, and all other decisions in which this court has required a special instruction on circumstantial evidence."

In the present case, the jury was given the pattern instruction on burden of proof, presumption of innocence, and reasonable doubt. See PIK Crim. 3d 52.02.

## II. AGGRAVATED ASSAULT CHARGE

K.S.A. 21-3408 and K.S.A. 21-3410 provide that an aggravated assault "is intentionally placing another person in reasonable ap-

prehension of immediate bodily harm" committed with a deadly weapon. The jury was instructed on the aggravated assault charge that the State had to prove defendant intentionally placed Sarah Blackman in reasonable apprehension of immediate bodily harm and used a deadly weapon. Defendant contends that Sarah denied believing that he posed an immediate threat to her and that her denial precluded the State from proving a necessary element of the aggravated assault charge.

Sarah testified: "I was looking at her and he reached around on his right side and he took out a gun and he held it in his hand towards me and said keep driving." She said that defendant produced the gun from his right side. When defendant spoke to Sarah, he had his hand in front of him and the gun was lying in his hand with the barrel pointed at her or slightly to Sarah's left. Defendant was looking at Sarah. Defense counsel's cross-examination of Sarah included the following:

"Q. And you didn't perceive that as a threat to you, did you?
"A. No. As long as I didn't get involved.
"Q. Okay. But you didn't sense that he was pointing it to you like a threat?
"A. No.
"Q. And you didn't think he was going to hurt you?
"A. As long as I didn't get involved.
"Q. Right. But you didn't think immediately at that point that he was intending to hurt you?
"A. No."

On redirect examination, Sarah explained what she meant when she said that she did not believe that he would hurt her unless she got involved: "I meant that if we had stopped to get involved I felt with this man holding a gun that, yes, our lives would be at stake. I felt very threatened." Then on recross-examination, Sarah agreed that defendant had not verbally threatened her life. She also agreed with defense counsel that "[h]arm was not being immediately threatened against" her.

Defendant relies on *State v. Warbritton*, 215 Kan. 534, 527 P.2d 1050 (1974). Defendant Warbritton and his wife, Carol, lived with her parents, Mr. and Mrs. Bailey. Warbritton shot and wounded Carol. When he emerged from the younger couple's bedroom,

Mrs. Bailey picked up the Warbritton baby and returned to the living room. Defendant then entered the living room, took a weapon off the wall, and pointed a gun at Mrs. Bailey as she held the baby. Warbritton was convicted of aggravated battery of Carol and aggravated assault of Mrs. Bailey. He argued on appeal that the State failed to prove an essential element of aggravated assault—that Mrs. Bailey was placed in fear of bodily harm. Defendant's mother-in-law testified that "she did not fear for her own safety; that she didn't think [defendant] would hurt her." 215 Kan. at 536. The State's first contention was that Mrs. Bailey's apprehension for the safety of the baby, a third person, constituted aggravated assault, and the court rejected it. "The apprehension of bodily harm to which the statute alludes must be the fear of the victim—the person who is assailed—for his or her own safety." 215 Kan. at 537. The State's fallback position was that "the circumstances under which the assault was made provide a sufficient basis for a finding that Mrs. Bailey 'was in immediate apprehension of bodily harm to herself.' " 215 Kan. at 537. The court rejected the State's second argument, too:

"We might agree that the atmosphere was heavily fraught with danger and was threatening enough to have induced apprehension on the part of Mrs. Bailey for her personal safety. However, Mrs. Bailey consistently denied while she was on the stand that she had any fear for herself; that she thought Mr. Warbritton would not harm her. She testified she was not scared for herself because she knew the way she was holding the baby, that the defendant would hit it instead of herself, if he pulled the trigger. In the face of positive testimony such as this we cannot say . . . that the circumstances were such that, as a matter of law, Mrs. Bailey had fear for herself." 215 Kan. at 537-38.

Two justices dissented on the following ground:

"Whether the mother-in-law was in immediate apprehension of personal bodily harm was a question for the jury to decide. What a person says about his fear or apprehension long after the incident occurred is not controlling. Actions may speak louder than words. On appeal if there is any sound basis in the evidence for a reasonable inference that Mrs. Bailey had fear and apprehension when the incident occurred it is our appellate duty to affirm the conviction . . . ." 215 Kan. at 538.

In summary, Sarah was less than 3 feet from a man with a gun. She had been placed in that position because Lisa had stopped

their car. Lisa was crying and pleading with them to please not drive by, to please help her, and Sarah stated that she would help her. Sarah then inquired as to what was going on, at which point defendant reached around on his right side, took out a gun, and held it in his hand. Sarah testified that she panicked and said, "[O]h, my God, drive, drive, keep driving, he's got a gun." This is a statement that the jury may well have found was made before defendant told them to keep driving. When the Blackmans drove to look for a telephone, Sarah testified that she (Sarah) was still hysterical.

Darrell testified that Sarah asked him to drive on and that she was frightened. He indicated that Lisa was "[t]errorized, very frightened, scared to death, very frightened," and that Lisa said, "Just please don't drive by. She either said I'm in trouble or in danger, one of that." To that, Sarah replied, "We will not drive by, we will help you, we'll stay here." But then, Sarah again "asked him to drive on" and, as he started to do so, she said "he [defendant] had a gun."

Experienced counsel for defendant was able to point out some inconsistencies in the testimony of the two witnesses, but nothing that a jury would have to find persuasive.

It seems only reasonable that a jury would find Sarah was frightened and that if she did not comply with defendant's demand that she and her husband leave the area, she would be harmed. Sarah obviously had great fear for her safety and well-being. Under the circumstances, we have no difficulty in concluding that when the evidence is viewed in the light most favorable to the prosecution, a rational factfinder could have found defendant guilty beyond a reasonable doubt of the crime of aggravated assault. The fact Sarah testified that she did not feel threatened as long as she complied with defendant's demands would not change the result under the facts of this case.

## III. PAST INCIDENTS OF DEFENDANT'S ANGRY AND VIOLENT BEHAVIOR

Except as otherwise provided by statute, constitutional prohibition, or court decision, all relevant evidence is admissible. See

K.S.A. 60-407(f); *State v. Smallwood*, 264 Kan. 69, 84, 955 P.2d 1209 (1998). The admission of evidence lies within the sound discretion of the trial court. Defendant, who asserts that the court abused its discretion, bears the burden of showing that the trial court's action was arbitrary, fanciful, or unreasonable.

On appeal, defendant complains of the admission over objection of the following evidence: (1) the prosecutor's questioning defendant about two workplace incidents that resulted in defendant's being "written up"; (2) his former wife's testimony of verbal and physical abuse; and (3) the prosecutor's questioning defendant about his former wife's testimony. Defendant contends that the State secured admission of the evidence on false bases, his former wife's testimony was false, and the evidence of workplace incidents was blown out of proportion. The State's position is that the evidence was properly admitted for the purpose of rebutting the defense theory that defendant was a self-blaming person whose anger was not directed at others, and that his conduct on the morning he killed Lisa accordingly was self-blaming and nonaggressive.

*a. Workplace incidents.* Out of the presence of the jury, the trial court heard arguments on admission of evidence of workplace incidents. The State sought to introduce evidence of formal reprimands stemming from two incidents in 1990 and 1991. The trial court's statement of the issue centers on the legal defense of mental disease or defect that would cause defendant to lack the capacity to form premeditation or intent to kill the victim:

"May specific instances of conduct be used not to impeach a defendant's claim of having a character trait for nonviolence or anger toward others but as substantive evidence to rebut defendant's defense of a mental disease or defect when the defendant's expert has testified that [they were] a basis for her opinion that the defendant did not have the capability to form the requisite criminal intent at the time of the crime[?] It was her belief that the defendant's repressed anger was of the type that did not manifest itself in the form of violence toward other people."

The trial court based its admission of the evidence on *State v. Cramer*, 17 Kan. App. 2d 623, 841 P.2d 1111 (1992).

In *Cramer*, Janette Cramer's defense for killing her husband was battered woman's syndrome. The State countered Cramer's psychiatrist's testimony with the testimony of another psychiatrist

whose opinion that Cramer did not suffer from the syndrome was based in large measure on the contested evidence of specific instances of conduct. The State's expert witness stated that the incidents where Cramer kicked a vulnerable man, fought with another woman at a wedding party, and "crossed swords" with a tavern bouncer were "inconsistent with those characteristics associated with the battered woman's syndrome." 17 Kan. App. 2d at 626-27. The Court of Appeals concluded:

"The evidence of past conduct by defendant was certainly not complimentary to her. However, defendant opened the door to such testimony by her reliance on the battered woman's syndrome as a defense. The State had every right to rebut that defense, and it did so, in part, by using specific instances of past conduct between defendant and third parties. Indeed, these specific instances were relied upon by the State's expert to support her opinion that defendant did not suffer from the battered woman's syndrome. While the evidence may have been prejudicial, it was certainly probative to the issue at hand. The evidence complained of was proper rebuttal.

" 'Rebuttal evidence is that which contradicts evidence introduced by an opposing party . . . . [I]t may refute or deny some affirmative fact which an opposing party has attempted to prove. It may be used to explain, repel, counteract or disprove testimony or facts introduced by or on behalf of the adverse party . . . . The use and extent of rebuttal rests in the sound discretion of the trial court and its ruling will not be reversed unless it appears the discretion has been abused to a party's prejudice.' State v. Richard, 235 Kan. 355, Syl. ¶ 1, 681 P.2d 612 (1984).

"In the final analysis, the trial court determined that the probative value of the evidence outweighed the prejudicial effect of that evidence. This was a proper decision for the trial court, and we will not substitute our judgment for that of the trial court on this issue." 17 Kan. App. 2d at 627-28.

Defendant would distinguish *Cramer* on the ground that in *Cramer*, the State's expert witness directly addressed in her testimony the evidence of Cramer's conduct. Defendant's point is that in *Cramer* the specific incidents of prior conduct were admitted as part of the expert testimony for and against the state-of-mind defense theory. In contrast, in the present case the specific incidents of prior conduct were not the subject of testimony by the State's expert witness.

In the present case, defendant admitted the workplace incidents and testified that he could not remember whether he had advised his expert psychological witness, Dr. Hutchinson, of them.

Through this line of inquiry, the State showed that the expert opinion on which the defense theory was based may have been formulated without complete information. Thus, although the circumstances in which the evidence was admitted in this case differed somewhat from those in *Cramer*, there is no error in admission of evidence of the workplace incidents.

*b. Former wife's testimony and inquiry of defendant on the subject.* Julie Rodman and defendant married in May 1991 and separated in November 1993. She testified that he always was verbally abusive to her when he was angry. She also recounted two times when he became angry at something she said and was physically abusive to her. Once he hit her with the paint brush he was holding and the other time "he knocked [her] over with the back of a chair, chased [her] down the stairway, pulling at [her] hair and kicking at [her]." Defendant denied ever being verbally or physically abusive to his former wife.

On appeal, defendant asserts that this court has approved admission of evidence of marital discord only where the homicide defendant and victim were a married couple. In fact, the rule in Kansas in a case of marital homicide is that evidence of marital discord may be relevant on the issues of motive and intent. See *State v. Taylor*, 234 Kan. 401, 408, 673 P.2d 1140 (1983). The rule in Kansas is not that evidence of marital discord should be confined to cases of marital homicide, as defendant suggests. It just happens that the question of the admissibility of evidence of marital discord arises more in marital homicide cases than in nonmarital homicide cases.

Defendant cites *State v. Hedger*, 248 Kan. 815, 820, 811 P.2d 1170 (1991), as an example of a marital homicide case where evidence of marital discord was properly admitted. In that case, the court approved admission of evidence of the discordant marital relationship. Terry Hedger was an alcoholic who became violent when he was drinking. During July 1984, the police were called for four domestic disturbances in the Hedger household. Then Terry sought help for his drinking problems. The Hedgers did well until early April 1989, when he resumed his drinking. The couple fought, he resumed his violent conduct toward his wife, and within

a few days he shot her in the head. He claimed that he thought his wife was a prowler, and he claimed that the gun went off accidentally. The trial court admitted evidence of defendant's 1984 violent conduct. The State argued that the evidence was admissible under K.S.A. 60-455 and was admissible independent of the statute. This court stated: "While it may be true that admission of the evidence under K.S.A. 60-455 was somewhat questionable, we have repeatedly held that evidence of a discordant marital relationship is admissible, independent of the statute, to show the ongoing relationship between the parties." 248 Kan. at 820.

There is no ongoing relationship in the present case to serve as an independent basis for admission of the evidence of abusive conduct. K.S.A. 60-455 provides that evidence of specific instances of defendant's misconduct is inadmissible to prove his disposition to commit crime or civil wrong as the basis for an inference that he committed the premeditated murder of Lisa, but that such evidence may be admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. The State's position is that the former wife's testimony was relevant to show intent or absence of accident.

The State cites *State v. Drach*, 268 Kan. 636, 1 P.3d 864 (2000), in which the main issue at trial was whether Deanne Drach's fatal gunshot wound was self-inflicted or whether she had been murdered by the defendant, Roger Drach. "Deanne had an affair 28 years before her death, and she had been abused since her husband discovered the affair shortly after it occurred." 268 Kan. at 638. Evidence of defendant's prior acts of abuse of Deanne, including some that had occurred a number of years earlier, was admitted at trial. This court concluded the trial court did not abuse its discretion in admitting the evidence. 268 Kan. at 651. We so find in this case.

## IV. IMPOSITION OF HARD 40 SENTENCE

Since defendant's principal brief was filed, this court has considered and determined this question contrary to the arguments de-

fendant makes here. *State v. Conley*, 270 Kan. 18, 11 P.3d 1147 (2000). In Syl. ¶ 3 of *Conley*, the court stated:

"Imposition of the K.S.A. 21-4638 hard 40 sentence based on a fact not found by the jury does not increase a defendant's maximum sentence of imprisonment for life imposed under K.S.A. 21-4706(c). The hard 40 sentence limits the lower end of the sentence. Defendant's hard 40 sentence violates neither the Due Process Clause of the United States Constitution, nor his right to trial by jury under the 6th Amendment to the United States Constitution or § 5 of the Kansas Constitution Bill of Rights."

In his reply brief, defendant questions this court's rationale in *Conley*. His argument amounts to the contention that *Conley* was wrongly decided and a request that it be reconsidered. We decline to do so.

## V. HEINOUS, ATROCIOUS, OR CRUEL MANNER

The trial court imposed a hard 40 sentence based on its finding that defendant committed the murder in an especially heinous, atrocious, or cruel manner, and that the aggravating circumstance was not outweighed by mitigating circumstances. See K.S.A. 21-4635; K.S.A. 21-4636(f); K.S.A. 21-4638. The trial court noted aspects of the evidence on which its finding was based:

"The evidence shows on January 6th, 1999, Miss Sears was confronted by the defendant with a handgun.

"Court further finds the evidence establishes that Miss Sears was visibly in a state of extreme fear prior to the shooting.

"The evidence shows the defendant shot at the victim until he had exhausted all the bullets in the weapon.

"The evidence further shows that the shots were fired at close range.

"The evidence further shows that Mr. Lessley shot Miss Sears repeatedly as she lay helplessly on the ground after already having been shot.

"The evidence shows that Miss Sears sustained five entrance gunshot wounds at the hands of the defendant.

"The evidence further shows that Miss Sears was conscious for an appreciable period of time after having been shot.

"The evidence shows that Mr. Lessley made no reasonable attempt to render aid to Miss Sears.

"The court concludes from all the evidence presented at trial that Miss Sears was placed in extreme fear by the defendant prior to the shooting.

"Court further concludes from all the evidence that Miss Sears was aware of her fate on January 6th, 1999.

"The evidence establishes that she was in extreme fear of harm at the hands of Mr. Lessley who was brandishing a handgun.

"The court further concludes that the evidence establishes Miss Sears experienced conscious physical pain and suffering as a result of the gunshot wounds inflicted upon her by Mr. Lessley that subsequently resulted in her death.

"The court further concludes that Miss Sears not only experienced conscious physical pain and suffering from the wounds inflicted, but also suffered mental anguish. Mental anguish as a result of knowing she had been shot several times and the uncertainty of not knowing if she was going to live or die."

On appeal, defendant challenges the sufficiency of the evidence for establishing that the murder was committed in an especially heinous, atrocious, or cruel manner. Our standard of review is whether, after a review of all the evidence, viewed in the light most favorable to the State, a rational factfinder could have found by a preponderance of the evidence the existence of the aggravating circumstance. *State v. Bedford*, 269 Kan. 315, 329-30, 7 P.3d 224 (2000).

Defendant asks the court to compare the evidence in this case with that in *State v. Spry*, 266 Kan. 523, 534, 973 P.2d 783 (1999); *State v. Follin*, 263 Kan. 28, 947 P.2d 8 (1997); and *State v. Cook*, 259 Kan. 370, 913 P.2d 97 (1996). In each of those cases, a finding that the killing was committed in an especially heinous, atrocious, or cruel manner was overturned.

In *Cook*, the court reiterated that in Kansas the manner of a shooting death generally is not considered to have been especially heinous, atrocious, or cruel. The evidence that merited mention by the court was the following:

"The State points out that the defendant shot the victim twice, once in the chest and once in the back, while the victim was in bed as a defenseless AIDS patient. Further, the coroner testified that Duty died as a result of hemorrhaging from the bullet wound that entered his chest. According to the State, the jury could have reasonably inferred that death by hemorrhage is not instantaneous. Further, the jury could surmise that Duty had time to experience pain and suffering before he bled to death based on the fact that Duty was shot more than once, his legs were tangled in the bed sheet, his head and shoulders were raised above the bed, and he was twitching. In fact, the State contends that based on the two gunshot wounds, the victim was either facing the defendant and turned away to prevent being shot again or was shot in the back and turned to see who shot him. According to the State, this pain, suffering, fear, and knowledge of impending death expe-

rienced by the victim before he bled to death was similar to the type of torture which the victim in *Alford* experienced before her own death. The State concedes that the victim's 'torture' in this case did not last as long as the victim's torture in *Alford*. However, the State contends that this difference is irrelevant because any form of torture can be seen as heinous, atrocious, or cruel. Thus, the State asserts that the evidence indicates the defendant engaged in conduct above and beyond the mere shooting itself and that such evidence is sufficient to permit a rational factfinder to conclude that the crime was committed in a particularly heinous, atrocious, or cruel manner beyond a reasonable doubt.

"All murders are heinous, atrocious, and cruel. The legislature, by using the phrase 'in a particularly heinous, atrocious, or cruel manner,' meant that the heinous, atrocious, or cruel manner must be in a special or unusual degree, to an extent greater than in other cases. Even when this evidence is viewed in the light most favorable to the prosecution, a rational factfinder could not find that the shooting was committed in a special or unusual degree or to an extent greater than in other cases so as to support the existence of the aggravating circumstance that this crime was committed in a particularly heinous, atrocious, or cruel manner beyond a reasonable doubt. Most of the State's arguments regarding 'torture' experienced by the victim in this case are based on conjecture or speculation." 259 Kan. at 402-03.

In *Follin*, too, it was a matter of speculation whether defendant inflicted serious mental anguish on his victims. Follin killed his two young daughters by stabbing each in the heart with a butcher knife. The court rejected the State's evidence of extreme cruelty and its suggestion that the killings were atrocious within the meaning of the statute due to the young ages of the victims. 263 Kan. at 50-51.

In *Spry*, the victim died of multiple ax wounds to the back of her head. There were no "defensive" wounds. The victim was struck from the back as she was lying face down in her bed and her neck was broken by the impact of the blows. "There was no evidence that she either was subjected to repeated blows while living or knew the nature of Spry's weapon. The pathologist could not conclude whether Chaffee was conscious or unconscious at the time of the attack. There is no evidence showing that Chaffee had any awareness of the physical assault which resulted in her death." 266 Kan. at 534-35. The court concluded that, measured by the standards set forth in *Cook* and *Follin*, the evidence was insufficient as a matter of law to support the jury's finding that the murder was

committed in an especially heinous, atrocious, or cruel manner. 266 Kan. at 535.

In the present case, the State's position is that defendant's inflicting serious mental anguish on the victim before her death makes this murder especially heinous, atrocious, or cruel. In *State v. Willis*, 254 Kan. 119, Syl. ¶ 4, 864 P.2d 1198 (1993), the following explanation of this aggravating circumstance was approved:

"The term 'heinous' means extremely wicked or shockingly evil; 'atrocious' means outrageously wicked and vile; 'cruel' means pitiless or designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the sufferings of others.

"A crime is committed in an especially heinous, atrocious, or cruel manner when the perpetrator inflicts serious mental anguish or serious physical abuse before the victim's death. Mental anguish includes a victim's uncertainty as to [his] or [her] ultimate fate."

In addition to *Willis*, the State cites *State v. Alford*, 257 Kan. 830, 896 P.2d 1059 (1995), and *State v. Gideon*, 257 Kan. 591, 894 P.2d 850 (1995).

*Alford* is a standard citation for the prosecution when the victim died from a gunshot wound or wounds. In that case, the defendant characterized the murder as "simply a routine shooting." 257 Kan. at 837. The court did not agree:

"Generally, deaths caused by shooting do not result in a finding that the manner in which they were conducted was heinous, atrocious, or cruel. See Malone, *The Kansas 'Hard-Forty' Law*, 32 Washburn L.J. 147, 156 (1993), stating that, as a general rule, deaths caused by stabbing, bludgeoning, strangling, burning, or drowning often result in a finding of this circumstance, while deaths from shooting do not. However, in this particular case, there was sufficient evidence to conclude that Jackson was killed in a heinous, atrocious, or cruel manner.

"The record reveals that the defendant entered the kitchen waving his gun. He chased Jackson into the lobby of the restaurant and shot her twice. He then forced Jackson back into the kitchen and when she attempted to flee, shot her again. Finally, as she was barely moving yet still trying to escape, he dragged her around the corner of the kitchen, all the while attempting to fire the gun which had jammed. After a long series of clicks from the jammed gun, he administered the final two bullets. Based on these facts, the jury's determination that the murder was committed in an especially heinous, atrocious, or cruel manner is supported by substantial competent evidence." 257 Kan. at 838.

In *Gideon*, this court rejected defendant's contention that the evidence was insufficient to find the murder was committed in an

especially heinous, atrocious, or cruel manner. 257 Kan. at 612-13. Gideon raped and sodomized his victim, took her to a deserted rural location, forced her to stand naked in a field, handed her a screwdriver, and told her one of them was going to die. Gideon then strangled her to death. Thus, there was evidence that the victim knew for an extended period of time that she was going to die and she was killed in a way that did not result in an instantaneous death. Further evidence that she anticipated her own death was that she "asked the defendant to make sure her mom and dad knew she loved them both." 257 Kan. at 602.

In the present case, the trial judge found that Lisa suffered mental anguish before she was shot when she was terrified by defendant's brandishing his gun and she suffered further mental anguish after being shot when she lay "for an appreciable period of time" conscious and bleeding. During that time, Lisa repeatedly told the man who came to her aid that she loved her mom and sister. In addition to mental anguish, the trial judge found that Lisa suffered the physical anguish of five wounds from shots fired at close range. The evidence, viewed in the light most favorable to the State, supports the trial court's findings of mental and physical anguish, and, therefore, it can be said that a rational factfinder could have found by a preponderance of the evidence the existence of the aggravating circumstance of an especially heinous, atrocious, or cruel manner of murder.

## VI. MITIGATING AND AGGRAVATING CIRCUMSTANCES

On appeal, defendant argues that, even if the court agrees that the murder was committed in an especially heinous, atrocious, or cruel manner, it was an abuse of the trial court's discretion to find that the single aggravating circumstance was not outweighed by multiple mitigating circumstances. It is firmly established, however, that "[w]eighing aggravating and mitigating circumstances is not a numbers game. 'One aggravating circumstance can be so compelling as to outweigh several mitigating circumstances.' [Citation omitted.]" *Bedford*, 269 Kan. at 331-32.

Defendant lists ten mitigating circumstances, including four statutory factors. At the top of the list are his seriously disturbed men-

tal condition and his lack of any criminal history. Defendant contends that if the trial court had considered evidence of the mitigating factors in the light most favorable to him, it would have concluded that the mitigating circumstances outweighed the aggravating circumstance. See *State v. Spain*, 263 Kan. 708, 720, 953 P.2d 1004 (1998); K.S.A. 21-4635(c).

Affirmed.

ALLEGRUCCI, J., concurring and dissenting. I dissent from the majority's opinion upholding defendant's conviction for aggravated assault and the imposition of the hard 40 sentence.

As noted in the majority opinion, an element of aggravated assault "is intentionally placing another person in reasonable apprehension of immediate bodily harm" committed with a deadly weapon. See K.S.A. 21-3408; K.S.A. 21-3410. The majority stated: "Sarah obviously had great fear for her safety and well-being." Obviously, the majority subscribes to the view that if it looks like a duck, walks like a duck, and quacks like a duck, it's a chicken.

Sarah's testimony was crystal clear and susceptible to only one interpretation. Her testimony is set out in the majority opinion. She obviously was not in *apprehension* of *immediate* bodily harm. Defendant did not threaten Sarah. He did not point the gun at her. The majority ignores Sarah's testimony and our decision in *State v. Warbritton*, 215 Kan. 534, 527 P.2d 1050 (1974). *Warbritton* controls. Sarah testified she had no apprehension of immediate harm. I fail to understand the majority's statement that Sarah's testifying she did not feel threatened if she complied with defendant's demands is immaterial "under the facts of this case." The evidence does not support the conviction for aggravated assault.

I next turn to the majority's affirming the imposition of the hard 40 sentence. On appeal, the test is whether a rational factfinder reviewing all the evidence, viewed in a light most favorable to the prosecution, could find by a preponderance of the evidence the existence of the aggravating circumstances. *State v. Bedford*, 269 Kan. 315, 329-30, 7 P.3d 224 (2000).

The majority simply repeats the findings of the trial court, but fails to apply the above test to the evidence presented in this case.

The majority in finding the murder was committed in an especially heinous, atrocious, or cruel manner does not review the evidence to support such a conclusion.

There were two eyewitnesses to the shooting, Susan Duke and Patricia Ward. Susan Duke testified that she saw Lisa back away from defendant and hold up her right arm. She then testified:

"A. In what seemed like just a matter of seconds, the man who had been holding the gun down to this right side raised it up and fired the gun.

"Q. And what, if anything, did you do at that point?

"A. I ran for the phone.

"Q. And what were you doing with the phone?

"A. I called 911.

"Q. And was there anything else occurring as you were calling 911?

"A. I continued to hear the sounds that I heard when I heard the first gunshot. I heard more gunshots.

"Q. And do you know at that particular point in time how many additional gunshots you heard, Miss Duke?

"A. I know at least two.

"Q. Now, after you had heard these additional gunshots did you move about in your apartment any? Did you move around in your apartment?

"A. Yes. As I was on the phone with 911.

. . . .

"A. Yes, I was, while I was still on the phone.

"Q. And what did you see when you looked out your son's window?

"A. I saw that the man was still there with the gun.

"Q. Could you see the woman with the dog at that point?

"A. No, I could not.

"Q. And did you observe anything else occur at that point?

"A. I saw the man with the gun turn and run away from the scene."

Patricia Ward was busy at her desk and noticed defendant and Lisa. She watched them walking and talking and testified:

"Q. And what was going on outside?

"A. Well, after I heard the scream I heard gunshots.

"Q. Okay. And how many gunshots did you hear?

"A. I think I heard two when I decided to pick up the phone and call.

"Q. Okay. And where were you at when you heard the gunshots?

"A. I was standing in the window.

"Q. Okay. Of your office?

"A. Uh-huh.

. . . .

"Q. Okay. Now, after you'd heard the gunshots did you do anything else other than pick up the phone?

"A. I picked up the phone to call the manager, the owner's son, and he told me to hang up and call 911.

"Q. Did you do that?

"A. Uh-huh.

"Q. Did you observe anything else? Did you see anything else?

"A. While I was on the phone with 911 I observed shooting, more shooting.

"Q. Okay. Tell the members of the jury with regards to the shooting you observed what specifically it is that you saw.

"A. Shooting.

"Q. Okay. And when you say you saw shooting, I'm not nit-picking here but describe that for us, if you will.

"A. Okay. While the shooting was going on she fell. She was standing up and she ended up falling on the ground and the shooting continued.

"Q. Okay. And when the shooting continued how many shots were fired, if you know?

"A. I thought it was about five shots.

"Q. Okay. Now, you say that you saw a lady fall down. Can you tell us where it is or point to where it is that the lady fell down.

"A. There's some grass like in this area.

. . . .

"Q. All right. Now, after the shooting occurred what happened at that point?

"A. I was on the phone with the 911 lady asking her to hurry and get somebody over there to help, and she told me to stay on the phone and I remember seeing people, a lot of commotion. The police car showed up. There were people in the area and I remember the man that was shooting got up and sort of backed away, like looking at Lisa on the ground.

"Q. Okay. Now, this man that backed away looking at Lisa on the ground, is that the individual that shot her?

"A. Yes.

"Q. Now, what did he do after he looked at her on the ground?

"A. I just remember him standing there. I don't—didn't really keep my eye on him."

The only finding by the trial court that could arguably distinguish this shooting death from those where this court has vacated a hard 40 sentence would be defendant repeatedly shooting Lisa as she lay helpless on the ground. Neither eyewitness so testified. Patricia Ward indicated defendant shot Lisa and continued to empty his gun as she fell to the ground. He emptied the gun into Lisa. To find that he shot her and then stood over her and shot her five more times while she lay conscious and helpless on the ground is

nothing more than speculation and conjecture. The evidence does not support such a finding.

What is equally telling is that the State's attorney, in arguing for imposition of the hard 40 sentence, never once mentioned or argued that defendant shot Lisa while she was lying helpless on the ground. In addition, the trial court relied on Lisa suffering mental anguish after she was shot and lying on the ground as a factor for the imposition of the hard 40 sentence. According to the trial court, she was lying on the ground and did not know whether "she was going to live or die." That would be true in most, if not all, shooting deaths where death is not instantaneous. The great mental anguish needs to occur before she was shot and not as a result of the shooting. Defendant did nothing to Lisa after he shot her. There was no physical or mental abuse by defendant before Lisa died.

The finding that Lisa was "aware of her fate" and "was in extreme fear of harm at the hands of Mr. Lessley" is likewise not supported by the record. As defense counsel pointed out, if that were the case then Lisa would have gone to the driver's side of the Blackmans' car and put the car between herself and defendant. She did not try to get in the car, nor did she tell them defendant was trying to kill her. Instead, she said, "Please stop. Don't drive away. I need help."

We don't know whether she was concerned about herself or defendant. The only evidence before the court was defendant's testimony that he was talking to Lisa about committing suicide. Numerous people drove by or jogged by while defendant and Lisa were talking. She made no indication to them that she was in fear of being harmed by defendant. A finding that she was in fear of her life and knew of her impending death at the hands of defendant was not proven by a preponderance of the evidence. The State's response was: "As far as Lisa knowing about her death, your honor, the jury has found his actions were premeditated. This wasn't a sudden pulling out of the gun and during some seizure her being shot. There was premeditation in this act."

Not only does premeditation have nothing to do with whether Lisa knew defendant was going to kill her, but as defense counsel noted, it was also disingenuous for the State to make that argument

when it told the jury it could find premeditation can occur in an instant.

In *Spry* we said:

"All murders are heinous, atrocious, and cruel. *Cook*, 259 Kan. at 403. However, exceptional circumstances must exist before a murder can be classified as 'especially heinous, atrocious or cruel.' We have previously said: 'The hard 40 sentence should be reserved for special cases . . . . Otherwise, the legislature would have mandated the hard 40 sentence in all first-degree murder cases.' *State v. Willis*, 254 Kan. 119, 129, 864 P.2d 1198 (1993). 'A crime is committed in an especially heinous, atrocious, or cruel manner when the perpetrator *inflicts serious mental anguish or serious physical abuse before the victim's death. Mental anguish includes a victim's uncertainty as to [his] or [her] ultimate fate.'* (Emphasis added.) 254 Kan. 119, Syl. ¶ 4." 266 Kan. at 531.

In *State v. Cook*, 259 Kan. 370, 403, 913 P.2d 97 (1996), we said: "The legislature, by using the phrase 'in a particularly heinous, atrocious, or cruel manner,' meant that the heinous, atrocious, or cruel manner must be in a special or unusual degree, to an extent greater than in other cases."

It appears to me that the majority views all murders to have exceptional circumstances requiring a hard 40 sentence. I do not criticize its view; however, that is a decision for the legislature and not a majority of this court to make. This is a heinous, atrocious, and cruel murder, but it was not done "in a special or unusual degree, to an extent greater than in other cases."

I would reverse defendant's conviction for aggravated assault, vacate the hard 40 sentence, and remand for resentencing.

SIX, J., joins in the foregoing concurring and dissenting opinion.