(200 P.3d 1283)
No. 98,050

STATE OF KANSAS, *Appellee*, v. LORI D. WILSON, *Appellant*.

Opinion filed November 21, 2008.

*Sam S. Kepfield,* of Hutchinson, for appellant.

*Keith E. Schroeder,* district attorney, and *Paul J. Morrison,* attorney general, for appellee.

Before LEBEN, P.J., BRAZIL, S.J., and BUKATY, S.J.

BRAZIL, J.: Lori D. Wilson appeals two convictions of abuse of a child in violation of K.S.A. 21-3609. She argues the evidence was not sufficient to convict; evidence of prior acts was erroneously admitted; the trial court erred in denying her motion for a bill of particulars and her motion for a new trial; and finally, she alleges prosecutorial misconduct. We disagree and affirm.

During a 2-week trial, the jury heard from 38 witnesses and considered 70 exhibits regarding the family life of the minor victims, G.J.W., born February 17, 1990, and M.M.W., born May 18, 1992. The evidence ranged from the lives of their parents before the victims were born to events in the lives of the entire family before, during, and after the crimes charged. The wide-range questioning by both counsel prompted almost no objections, and none under K.S.A. 60-455.

In comparison to the evidence at trial, the criminal charges were relatively focused. Lori was charged with a single count of abuse of a child for each of the victims "on or about the 11th day of May, 2003, through the 12th day of April, 2005." The State's evidence showed that during the crimes period, the victims lived with Rodney W., their natural father, and Lori, who brought three children of her own to the marriage. Rodney and Lori and Lori's children had bedrooms on the second floor of the home.

In contrast, the victims were kept in makeshift enclosures on the first floor even though two upstairs bedrooms were being used for storage. The victims' enclosures were built of unfinished particle

board. One measured 11 x 7; the other was 10 x 4. We will further discuss the sordid evidence in our analysis of the issues.

Trial was held May 8-19, 2006. The trial court instructed the jury to decide whether Lori had "intentionally tortured or inflicted cruel and inhuman bodily punishment upon" each of the victims between May 11, 2003, and April 12, 2005. At Lori's request, the trial court defined "torture" as "to inflict intense pain to body or mind for purposes of punishment." The trial court also gave an aiding and abetting instruction, with the principal being Lori's husband, Rodney. Rodney was separately charged and tried, but some pretrial and posttrial hearings were conducted jointly.

The jury returned guilty verdicts on both counts. After sentencing, Lori moved for a new trial or dismissal based on the State's failure to produce all of G.J.W.'s medical records. The trial court held an evidentiary hearing, taking the testimony of 6 witnesses and receiving 24 exhibits. After considering the parties' proposed findings of fact and conclusions of law, the trial court filed a 26-page memorandum decision denying Lori's motion. Lori appeals.

### Sufficiency of the evidence

Lori argues that "(1) the behavior complained of does not fall under the statute, [and] (2) assuming that it did, the evidence was insufficient to convict her of the offense charged." Lori did not object below to the elements instructions, which generally followed the language of the charging statute, K.S.A. 21-3609. She also requested the instruction given on the meaning of "torture," which she fails to acknowledge on appeal while arguing for other definitions of torture. In any event, Lori does not suggest on appeal that any of the instructions were erroneous. There are, therefore, no issues regarding the instructions given. See K.S.A. 22-3414(3) (parties must object to instructions below); *State v. Walker*, 283 Kan. 587, 594, 153 P.3d 1257 (2007) (issues not briefed are deemed waived or abandoned); *State v. McCoy*, 34 Kan. App. 2d 185, 189-90, 116 P.3d 48, *rev. denied* 280 Kan. 988 (2005) (collecting cases refusing to review jury instructions requested by defendant).

Hence, Lori's assertion that "the behavior complained of does not fall under the statute" is only another way of saying that the evidence was insufficient to convict under the charging statute.

"When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. [Citations omitted.]" *State v. Gutierrez*, 285 Kan. 332, 336, 172 P.3d 18 (2007).

As applied here, abuse of a child is "intentionally torturing . . . or inflicting cruel and inhuman corporal punishment upon any child under the age of 18 years." K.S.A. 21-3609.

On appeal, as at trial, Lori attempts to mitigate the horror of the victims' lives by arguing they deserved it. She contends the victims exhibited aberrant sexual behavior, lied, stole, and destroyed property. "There was no evidence that the actions taken by [Lori] and her husband were seen as an end in themselves; rather, the evidence was quite clear that both children were deeply troubled and that the measures taken were disciplinary in nature."

Lori's descriptions of the victims' behavior was thoroughly controverted at trial. But that is beside the point. By arguing the "measures . . . were disciplinary," Lori concedes that they were intended as punishment. See Black's Law Dictionary 478 (7th ed. 1999) ("discipline": "Punishment intended to correct or instruct."). The punishment was obviously "corporal" as the statute puts it or "bodily" as the jury was instructed at trial following PIK Crim. 3d 58.11. The remaining question is whether the punishment was cruel and inhuman.

The Kansas Supreme Court has defined "cruel" in another context as "pitiless or designed to inflict a high degree of pain, utter indifference to, or enjoyment of the suffering of others." *State v. Lessley*, 271 Kan. 780, Syl. ¶ 4, 26 P.3d 620 (2001) (aggravating circumstances under K.S.A. 21-4636[f]). "Inhuman" may be defined as "not worthy of or conforming to the needs of human beings." Webster's Third New International Dictionary 1163 (1986). Considering these definitions or any conceivable ordinary meaning of the terms, a rational factfinder could have concluded beyond a reasonable doubt that the punishment was cruel and inhuman.

The victims were intentionally deprived of adequate space, heat, ventilation, light, recreation, socialization, bedding, sanitation, food, and clothing for prolonged periods. It is pitiless to intention-

ally deprive children of the necessities of life, and continuing to do so indicates indifference to or enjoyment of their suffering. Beyond all doubt, the conditions under which the victims lived were not worthy of or conforming to the needs of human beings. Lori argues there was no intent "to inflict any bodily harm," but abuse of a child does not require a specific intent to injure. See *State v. Carr*, 265 Kan. 608, 614-15, 963 P.2d 421 (1998), *disapproved on other grounds State v. Gunby*, 282 Kan. 39, 144 P.3d 647 (2006); *State v. Bruce*, 255 Kan. 388, Syl. ¶ 3, 874 P.2d 1165 (1994).

A rational factfinder could also have concluded beyond a reasonable doubt that Lori intentionally tortured the victims. Her actions were gratuitous, even malevolent. The victims were kept in makeshift enclosures while two bedrooms remained unoccupied. They had mattresses but could not use them. They were forced to wait in anxious uncertainty to use the restroom, knowing they would bear the stench if permission never came. They were punished if they reported infractions but punished more if they did not. Their requests to take a shower were not always granted, but if they failed to ask, they took cold showers. Lori sent them to school in ill-fitting, worn, and dirty clothing, while her own children were well clothed. G.J.W. testified that Lori sent him to school twice in a girl's shirt. M.M.W. testified and photographs showed that Lori would "chop . . . off" her hair such that the other children would ask M.M.W. if she "was a boy and would be just making fun of me." The victims nearly starved, knowing that Lori's children had their fill.

Lori urges this court to consider her evidence, but "an appellate court does not reweigh the evidence, determine the credibility of witnesses, or substitute its view of the evidence." *State v. Henderson*, 284 Kan. 267, 297-98, 160 P.3d 776 (2007). Viewing the evidence in the light most favorable to the prosecution, it was sufficient to convict Lori of abusing G.J.W. and M.M.W.

### Evidence of prior acts

Lori next argues that the trial court erred in admitting evidence of her "prior acts." She claims: "The information was clearly more prejudicial than probative. The jury was presented with a contin-

uing course of conduct spanning some 8 years prior to [Lori's] arrest. It was not material to proving the State's case and its admission by the [trial court] was an abuse of discretion."

Lori states on appeal that "[o]n November 5, 2005, [her] Counsel filed a motion objecting to the potential admission of evidence regarding [her] actions prior to 2005." Given that the charged period extended into 2003, perhaps the reference to "actions prior to 2005" is a typographical error. In any event, the trial court's appearance docket shows no filing on November 5, 2005. The filing Lori cites is her bill of particulars, not her motion in limine. Lori filed a motion in limine on January 24, 2006, but it involved the proposed testimony of a detective as to the severity of the crimes, not Lori's prior acts.

Lori also quotes from a transcript of a pretrial hearing held on November 10, 2005. Lori's trial counsel, Alice Osburn, was present at this hearing, but she did not formally join in the motion in limine discussed at that hearing, which had been filed by Rodney's counsel, Timothy O'Keefe. In the course of argument over K.S.A. 60-455 between O'Keefe and the prosecutor, Keith Schroeder, the trial judge stated, "Perhaps, since it appears to me based upon the puzzled look on Ms. Osburn and Mr. O'Keefe, and that that would appear to be a hotly contested issue, that perhaps the parties could write written briefs on that issue."

On December 2, 2005, Lori filed a brief challenging "evidence from [G.J.W.] that he was locked in his room prior to the events alleged in the [amended complaint]." On appeal from nearly 1,200 pages of trial testimony, Lori disputes only the 5 pages in which G.J.W. described being locked in the basement before he was moved to the enclosure. Any other evidence of Lori's "bad acts" was not raised in Lori's brief below, and it has not been argued on appeal. Lori, therefore, has waived or abandoned those issues. See *Walker*, 283 Kan. at 594; *State v. Shopteese*, 283 Kan. 331, 339, 153 P.3d 1208 (2007).

A review of the five pages of testimony from G.J.W. regarding his confinement in the basement shows that Lori did not then object at trial. It is well established that failure to object to evidence of prior bad acts bars appellate review. See *State v. Carapezza*, 286

Kan. 992, Syl. ¶ 7, 191 P.3d 256 (2008); *State v. Francis*, 282 Kan. 120, 138, 145 P.3d 48 (2006); *Wentland v. Uhlarik*, 37 Kan. App. 2d 734, 740, 159 P.3d 1035 (2007).

Lori's failure to object is not surprising given her trial strategy of placing the history of her family and each person in it before the jury. Testifying on her own behalf, Lori began with her upbringing which she said was "very strict." She moved on to the early lives of the victims, testifying for example that G.J.W. would portray sexual acts with dolls when he was 6 or 7 years old and that he attempted to perform oral sex on her own son at about the same age. According to Lori, this prompted the initial move of G.J.W. from the second-floor bedrooms.

Lori claimed that she was advised by a therapist never to leave G.J.W. and M.M.W. alone together. She described the treatment her own daughter with bipolar disorder had received, including a "seclusion room" in which "[t]hey locked her . . . for behavior that got out of control." Lori used these and other facts to explain the construction of the enclosures which she said were used to keep the victims apart and control their behavior. The lack of furnishings and other items were explained along similar lines. As the prosecutor pointed out in closing, "How does one justify what happened to these kids? One way is they're monsters. They have to be locked up. They have to be treated this way."

Lori's trial strategy was impossible without evidence of her "prior acts." She attempted to portray her actions during the crimes period as the end result of her increasingly desperate attempts to control the victims' behaviors. Having invited the admission of her prior acts at trial, she may not now complain on appeal. See *State v. Murray*, 285 Kan. 503, 522, 174 P.3d 407 (2008); *State v. Anthony*, 282 Kan. 201, 214-15, 145 P.3d 1 (2006).

## Motion for bill of particulars

Lori next argues the trial court erred by denying her motion for a bill of particulars. The motion was filed November 7, 2005, and heard on November 10, 2005. After hearing arguments, the trial court announced it would "issue a ruling on the bill of particulars." As Lori and the State agree, it never did so.

On January 10, 2006, the State filed its amended complaint/information. Lori did not renew her motion for a bill of particulars, and she did not object at trial. The January 27, 2006, hearing Lori cites on appeal concerned her motion for psychological testing, not her motion for a bill of particulars.

In an analogous case, *State v. Webber*, 260 Kan. 263, 283-84, 918 P.2d 609 (1996), *cert. denied* 519 U.S. 1090 (1997), a defendant challenged the adequacy of a bill of particulars. The Kansas Supreme Court found the issue "without merit" in part because the defendant had failed to object below. 260 Kan. at 285.

"The State's failure to timely and meaningfully comply with an order for a bill of particulars should be met with either a timely objection or a request for a continuance by the offended party and consideration by the trial court whether sanctions are merited, not a request for a new trial on appeal. [Citation omitted.] By failing to avail herself of the opportunity to request a continuance or objecting to the detail provided by the State and by proceeding to trial, [defendant] waived any right she may have had to require a more definite bill of particulars. [Citations omitted.]" 260 Kan. at 284-85.

The same rationale applies here. As in *Webber*, Lori moved for a bill of particulars. She now complains she did not receive one, even though she failed to object to the lack of a ruling, failed to renew her motion upon filing of the amended complaint/information, and failed to ask for a continuance of the trial. Lori has, therefore, waived the issue. See 260 Kan. at 285; see also *State v. Cory*, 211 Kan. 528, 533, 506 P.2d 1115 (1973) (where no motion for bill of particulars is filed, defendant "waived any right he may have had to require the state . . . to file a bill of particulars" by "proceeding to trial on the information").

### *Motion for new trial*

Lori next argues the trial court erred in denying her motion for a new trial. She seeks a new trial on two grounds—the evidence in question is newly discovered under K.S.A. 22-3501 and the evidence was suppressed in violation of *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), and K.S.A. 22-3212.

The evidence itself is of two types. The first is medical records showing G.J.W. was given growth hormones after being removed

.from the home. The second is medical records stating Lori's belief that the victims may have been sexually abused while in the care of their natural mother. The evidence is discussed first, followed by the analysis.

### Records of growth hormones

By all appearances, Lori attempts to avoid a direct claim on appeal that she was actually ignorant before the trial of G.J.W.'s growth hormone treatments. She generally focuses on the State's failure to provide her with records of his treatments. She does go further when summarizing an affidavit filed by Osburn. In the affidavit, Osburn had sworn: "It was not until the direct examination of the State's expert witness, Dr. Unsderfer, by the State that it was revealed to the defense that [G.J.W.] was receiving growth hormones."

This statement in Osburn's affidavit was not necessarily a claim of personal ignorance regarding the growth hormone treatments. If read narrowly, it could mean that the direct examination of Dr. Unsderfer was the first time *the State* had revealed the fact of growth hormone treatments to the defense. Read so narrowly, the statement is true.

Evidence at the new trial hearing showed that the State never possessed medical records of G.J.W.'s growth hormone treatments. The State's medical records stopped at June 1, 2005, and the growth hormone treatments did not start until about August 25, 2005. The State did receive updated growth charts from Dr. Unsderfer, apparently as an exhibit for trial, but these did not show the growth hormone treatments. At Lori's trial, therefore, the evidence of growth hormone treatments came in through Dr. Unsderfer's testimony, not medical records.

According to testimony at the new trial hearing, prosecutor Schroeder learned about the growth hormones during a conversation with Dr. Unsderfer. The conversation occurred after Rodney's trial in January 2006 but before Lori's trial in May 2006. Dr. Unsderfer asked Schroeder why neither party in Rodney's trial had asked about growth hormones. Dr. Unsderfer testified that Schroeder was "very surprised" and asked if G.J.W. "was on growth hor-

mone." Dr. Unsderfer testified he told Schroeder that G.J.W. was taking growth hormones and that Schroeder then asked for an opinion on the growth hormone treatments. Dr. Unsderfer testified he told Schroeder "it wouldn't make that much difference" because M.M.W., who had not been treated with the growth hormones, had grown about the same amount as G.J.W. and G.J.W.'s growth spurt had begun before administration of the hormones.

It does not appear that the State took any steps to inform defense counsel Osburn of this conversation. However, Rodney filed a motion for new trial based on the growth hormone issue 5 days before Lori's trial. Then, when Dr. Unsderfer testified regarding the growth hormones at Lori's trial, Osburn only objected based on the lack of medical records.

During argument on the objection outside the hearing of the jury, Osburn clearly indicated her prior knowledge of the growth hormone treatments: "I've never been provided knowledge . . . except Rodney [W.] found out about it because ordered restitution for it [he] has to pay $3,000 a pop for them." Later, she stated, "I am aware that Rodney [W.] has a Motion for New Trial based on newly discovered evidence on this same issue." Lori's objection at trial, therefore, was limited to the State's failure to produce any records of the treatment, not to her ignorance of the treatments.

She obscures this distinction on appeal by summarizing Osburn's affidavit as follows: "[O]nly upon direct examination of Dr. Unsderfer was she made aware of the use of the growth hormone." That is not necessarily what Osburn swore to in the affidavit, and it does not reflect Osburn's actual knowledge. Osburn knew of the treatments before trial.

Lori makes other statements on appeal which are less than accurate. She asserts that Dr. Unsderfer mentioned the growth hormone treatments "[h]alfway through the trial," but the doctor was only the third of the State's 16 witnesses. Lori also hints that the medical records Dr. Unsderfer gave the State on June 1, 2005, contained the information about the growth hormones, which was impossible because the treatment had not yet started. She then hints more darkly, "[T]hose records were not provided to anyone else." That is also not true because the State provided Lori with

discovery on the records in the State's possession, meaning records up to June 1, 2005. The records simply did not mention the growth hormones.

Upon Osburn's objection, the State then bifurcated Dr. Unsderfer's testimony, calling him again at the end of its case-in-chief to provide Osburn time to prepare for cross-examination. The trial judge also ordered the medical records of the growth hormone treatments to be provided to Osburn for review by Lori's medical expert.

This expert, Richard Charles Gilmartin, M.D., testified in Lori's case-in-chief that he had reviewed the medical records. He was not asked if he needed more time for review, however, or whether the delay in obtaining the medical records had affected his opinion in any way. Dr. Gilmartin merely testified to the function of growth hormones generally, and he offered opinions that although G.J.W. did not need treatment, it "played a role" in his weight gain. The doctor's main concern was that both victims "are being overfed" and were "on their way" to being obese. He never examined the victims.

Lori asserts on appeal that "given time and opportunity, defense counsel would have been provided an opportunity to retain an expert witness in pediatric endocrinology." The hearing on the motion for new trial was held on August 31, 2006, and October 2, 2006, several months after Lori's trial. She did not proffer any such evidence.

On appeal, she relies on the following characterization of Dr. Unsderfer's testimony: "Dr. Unsderfer opined at the hearing that a pediatric endocrinologist, given the complete and accurate medical charts, could very well have found that the growth experienced by G.J.W. after being taken into custody, and particularly after August 2005, could have been attributed solely to [human growth hormones.]" This is perhaps a too broad reading of the transcript from the joint new trial hearing, although the testimony was admittedly not crystal clear.

Rodney's counsel twice asked Dr. Unsderfer whether a pediatric endocrinologist could have found that G.J.W.'s growth was attributable solely to growth hormones. Each time the State objected as

to speculation, and the objection was sustained. The trial judge then told Rodney's counsel, "I think you could rephrase it properly if you're going to deal with not whether another physician, but dealing with accepted medical literature." Rodney's counsel and Dr. Unsderfer next had the following exchange:

"Q. (By Mr. Rathbun): Within accepted medical research and literature on human growth hormone, is it not correct that opinions contrary to yours, that is that the entire growth height and weight was due to the growth hormone administration, could be legitimately found?
"A. That's true. That statement is true; could be a legitimate finding."

### Records of sexual abuse

Lori states that medical records in a "separate file referred to possible sexual abuse of [M.M.W.] at age 4." This is the file designated "34-18," which was kept by one of the victims' prior physicians, James Lynn Casey, M.D. Lori fails to mention that file 34-18 simply recorded suspicions Lori had herself voiced to Dr. Casey's physician assistant in 1996 regarding sexual abuse of the victims. At trial, Lori extensively developed her theory that the victims had been sexually abused while in the care of their natural mother.

Lori claims these medical records were nevertheless crucial. She argues as follows: "Had Dr. Unsderfer known of the possible sexual abuse his opinion regarding the cause of [the victims'] condition would have been different because he would not have made a diagnosis of malnourishment at the hands of the parents." That is not entirely true.

Dr. Unsderfer acknowledged at the hearing on the motion for new trial that he had not considered eating disorders such as bulimia and anorexia. He acknowledged that he eliminated these causes of the victims' wasting because he "had no information that these children had any of the underlying psychological disorders that would indicate those conditions could be present." He acknowledged further that sexual abuse is a psychologically traumatic event for children and that "[i]t's a possibility" such trauma could produce eating disorders.

He nevertheless refused to agree with defense counsel that had he known about the allegations of sexual abuse, he "could not have proceeded to [the] diagnosis and opinion, the one [he] gave in court." Dr. Unsderfer pointed out that "if we're considering anorexia nervosa, bulimia, anything like that, first foremost, in males it's very rare." With regard to M.M.W., the doctor emphasized:

"[T]he growth pattern that she exhibited once she was out of the home . . . that's very atypical and is not consistent with anorexia nervosa because anorexia nervosa is a long-term diagnosis and it takes literally months to years to rehabilitate these kids. But not to make them grow like this."

The doctor did admit to telling defense counsel some weeks before the new trial hearing that he would have not necessarily diagnosed malnutrition for G.J.W. had he known of the diagnosis the victim received *after* being removed from the home, *i.e.*, reactive attachment disorder (RAD). This had nothing to do with file 34-18, however, and Dr. Unsderfer stated at the hearing that he had since changed his opinion regarding RAD based on further research.

Lori further attributes to Dr. Unsderfer the opinion that "psychological dwarfism, rather than malnutrition, could have explained the failure to grow." Dr. Unsderfer stated that some children who are not nurtured "actually can manifest a growth hormone deficiency which is reversible once the nurturing is given." He stated that in such a case, "[i]t's not the lack of nutrition, it's the lack of nurturing." He said it was impossible to diagnose psychological dwarfism in the case of G.J.W., however, because he had already received the growth hormone treatments. The diagnosis is also linked to RAD, not simply to sexual abuse as alleged in file 34-18.

Lori further claims that the RAD diagnosis was "kept from [Dr.] Unsderfer," but she makes no effort to explain how it was kept from *her*. That is the issue here. And although she lumps this discussion in with the rest of her arguments, she clearly bases her allegation of error only on "the omission of file 34-18 and the [growth hormones] therapy."

## Newly discovered evidence

A new trial may be granted "in the interest of justice" upon "newly discovered evidence." K.S.A. 22-3501. Lori bore the bur-

den to establish that the evidence in question could not have been produced at trial with reasonable diligence and that a reasonable probability exists of a different result upon retrial. See *State v. Cook*, 281 Kan. 961, 992, 135 P.3d 1147 (2006). The trial court's decision is reviewed for abuse of discretion. See *State v. Mathis*, 281 Kan. 99, 103-04, 130 P.3d 14 (2006). "The abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions." *State v. Stevens*, 285 Kan. 307, Syl. ¶ 6, 172 P.3d 570 (2007).

Of the evidence identified by Lori in this appeal, only file 34-18 was discovered after trial. The rest, being not only known but actually produced at trial, cannot be considered "newly discovered." See *Taylor v. State*, 251 Kan. 272, 288, 834 P.2d 1325 (1992) ("The evidence must be new.").

Moreover, given Lori knew of the growth hormone therapy before trial, she could have obtained the relevant medical records with reasonable diligence. Reasonable diligence would have revealed the growth hormone therapy even earlier. In fact, as discussed below, any error caused by the delay until trial was cured when the State bifurcated Dr. Unsderfer's testimony and the trial court ordered the medical records of the growth hormone treatments be provided to Lori's medical expert. Dr. Unsderfer's testimony at the new trial hearing was not sufficient to establish that testimony from a pediatric endocrinologist would have made a material difference. Lori, therefore, does not show a reasonable possibility of a different result upon retrial regarding any of the evidence actually produced at trial.

Turning to file 34-18, it only recorded Lori's concerns, stated numerous times throughout trial by her and others with whom she had shared them, that the victims had been sexually abused while in the care of their natural mother. The substance of the file was not new, and the file itself could not possibly produce a different result upon retrial. The point is meritless.

### Discovery violation

Whether a *Brady* violation requires a new trial is reviewed for abuse of discretion. See *State v. Adams*, 280 Kan. 494, 503, 124

P.3d 19 (2005). "The abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions." *Stevens*, 285 Kan. 307, Syl. ¶ 6.

"Prosecutors are under a positive duty, independent of court order, to disclose exculpatory evidence to a defendant. To justify a reversal of a conviction for failure to disclose evidence, the evidence withheld by the prosecution must be clearly exculpatory and the withholding of the evidence must be clearly prejudicial to the defendant. But evidence not disclosed to the defendant before trial is not suppressed or withheld by the State if the defendant had personal knowledge thereof, or if the facts become available to the defendant during trial and if he or she is not prejudiced in defending against those new facts." 285 Kan. 307, Syl. ¶ 9.

"There are three scenarios in which *Brady* applies," forming a "sliding scale" as "the level of intent supporting the State's conduct decreases." *Adams*, 280 Kan. at 501. Here, however, the question is resolved on the nature of the State's conduct, not its intent. Of the evidence in question, the State actually possessed only the knowledge that G.J.W. was taking growth hormone. The medical records themselves were never in the State's possession.

While Schroeder failed to convey the substance of his conversation with Dr. Unsderfer to Osburn, Osburn independently obtained knowledge of the growth hormone treatments before trial. Lori obtained this information later than the State, but she never moved for a continuance, never sought production of medical records before trial, and on appeal does not otherwise show prejudice. The knowledge was, therefore, "not suppressed or withheld by the State" in a way which triggers further inquiry into the State's intent. *Stevens*, 285 Kan. 307, Syl. ¶ 9; see also *United States v. Barker*, 467 F.3d 625, 629 (7th Cir. 2006) (" '[E]vidence for *Brady* purposes is deemed "suppressed" if (1) the prosecution failed to disclose the evidence before it was too late for the defendant to make use of the evidence, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence.' ").

As the trial court correctly noted, Lori "had equal access as the State to the records of the Medical Center and Dr. Unsderfer." This access was clearly demonstrated at the hearing on the motion for new trial. One of the witnesses at that hearing was Karen Lyons,

an investigator for Rodney's counsel. When she interviewed Dr. Unsderfer on December 1, 2005, he brought three files of the victims' medical records to the interview. Lyons did not copy any of the medical records, however. She claimed at the hearing that she was relying on the State to provide relevant medical records to her.

Although it appears that Rodney's and Lori's respective counsel were no longer cooperating by December 2005, Osburn took essentially the same stance at Lori's trial. When arguing her objection to Dr. Unsderfer's testimony, she contended, "[T]he State . . . is required to give me all documentation, everything relied on by expert to reach his opinion," and, "I think they have obligation to get it and to provide it to me if their expert is going to rely on records and they haven't—."

The State is required under K.S.A. 22-3212(a)(2) to "permit the defendant to inspect and copy or photograph" the "results or reports of physical or mental examinations." Lori never asserts that the State prevented her inspection or copying of the victims' medical records. She contends instead that the State bore a positive duty to search out medical records not already in its possession and forward them to her.

Lori does not identify the source of this supposed duty. No discovery orders required such a duty by the State. Lori cites Schroeder's statements at a November 10, 2005, hearing made in response to Lori's motion for a bill of particulars. Schroeder defended by maintaining that the "[S]tate has provided all of the reports in its file and continues to update those." This was not a specific reference to medical records, and nothing suggests that Osburn might have been fooled by Schroeder's general statement on her unrelated motion. This is established beyond doubt by Lori's citation to her own proposed findings of fact filed by Osburn. Osburn stated that on April 20, 2006:

"The State assured counsel that I should have all of the records they had and allowed the defense to review their file. Their medical records were the same as the ones they provided to the defense at the beginning of the case. The last record the defense had was from Dr. Unsderfer's first exam of the children."

Osburn admitted in this proposed finding that she knew before trial that the State held no records of the victims' ongoing medical care. She also admitted that she had everything the State had. If Osburn had actually expected the State affirmatively and continuously to update the victims' medical records, the State's failure to do so would have been evident to her on April 20, 2006.

Kansas case law also does not support Lori's contentions regarding the State's duty. In *State v. Marks*, 231 Kan. 645, 651-52, 647 P.2d 1292 (1982), for example, the State provided a defendant with the result of a rape kit. Defendant complained the State had not provided the working notes of the laboratory technicians, which were not in the State's possession. Construing K.S.A. 22-3212, the Kansas Supreme Court held the State had no such duty:

"We hold this statute entitles a defendant to the working notes of the forensic chemist who examines a rape kit. It does not, however, require the prosecutor to obtain those notes for defense counsel unless they are in the State's file. All the prosecutor must do is 'permit the defendant to inspect or copy or photograph any relevant' notes taken during the rape kit examination. Here the State provided defense counsel with the actual laboratory report. The working notes were not contained in its file and were not seen by the prosecutor prior to trial. They were, however, available to defense counsel upon request from those who performed the experiments." 231 Kan. at 652.

The Kansas Supreme Court reasoned similarly in *State v. Dressel*, 241 Kan. 426, 431-32, 738 P.2d 830, *cert. denied* 484 U.S. 968 (1987), where the dispute was over evidence gathered by a corporation. The evidence was not in the possession of the State, and our Supreme Court affirmed the trial court's refusal to provide discovery under K.S.A. 22-3212. The defendant should instead have proceeded under K.S.A. 22-3214 "to subpoena witnesses and to compel the production of documents." 241 Kan. at 432.

These authorities apply here. Moreover, to the extent there was any suppression, Lori does not show she was prejudiced. Given the extent of the State's evidence, there is not a reasonable probability that the result would have been different if Lori had possessed before trial all the evidence she identifies here. See *Haddock v. State*, 282 Kan. 475, 507, 146 P.3d 187 (2006).

### Prosecutorial misconduct

Lori finally argues "the prosecutor's conduct in deliberately withholding evidence of human growth hormone treatment also amounts to prosecutorial misconduct." This issue is limited to Schroeder's knowledge, obtained during his conversation with Dr. Unsderfer, that G.J.W. was taking human growth hormones. Lori does not argue based on the medical records.

*Brady v. Maryland*, 373 U.S. 83, 87, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), prosecutorial misconduct is not analyzed under the general prosecutorial misconduct standard set out in such cases as *State v. Albright*, 283 Kan. 418, Syl. ¶ 6, 153 P.3d 497 (2007). Instead,

"[t]he three components or essential elements of a *Brady* . . . prosecutorial misconduct claim are: The evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; the evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Haddock*, 282 Kan. 475, Syl. ¶ 13.

See *Wilkins v. State*, 286 Kan. 971, 190 P.3d 957 (2008).

Evidence that G.J.W. was taking growth hormone was arguably favorable to Lori. It was exculpatory to the degree it provided some explanation, beyond malnutrition, why G.J.W. grew so much after being removed from the home. The probative value was very limited, however. M.M.W. grew the same amount without growth hormones. There were numerous other signs of malnutrition. Lack of food was only one of the many deprivations suffered by the victims.

As for suppression, Dr. Unsderfer testified that he told Schroeder the growth hormone treatments would not make much difference. This mitigates Schroeder's failure to tell Osburn. *State v. Campbell*, 29 Kan. App. 2d 50, 23 P.3d 176 (2001), cited by Lori, is easily distinguishable. In *Campbell*, the time of death, "[o]ne of the key issues," was not listed in the treating physician's medical records and the prosecutor incorrectly told the defense that the State had no time of death evidence. 29 Kan. App. 2d at 56-58. Here, the growth hormone treatments were not a key issue, and Lori could have learned of the treatments had she subpoenaed

G.J.W.'s medical records and/or interviewed Dr. Unsderfer. Schroeder also made no representation regarding the treatments. The most critical fact remains that Osburn learned of the growth hormone treatments before trial. The State did not suppress the evidence in violation of *Brady*. See *Stevens*, 285 Kan. 307, Syl. ¶ 9; *Barker*, 467 F.3d at 629.

Finally and most clearly, there was no prejudice. Lori's lack of response when she learned of the growth hormone treatments before trial suggests the discovery was not sufficient to alter her strategy. The State's evidence was also overwhelming. Lori does not show a reasonable probability that had she learned of the growth hormone treatments earlier, the result of the proceeding would have been different. See *Haddock*, 282 Kan. at 507.

Affirmed.