NOT DESIGNATED FOR PUBLICATION

No. 126,703

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee,*

v.

JASMINE LYNELL HARRIS,
*Appellant.*

MEMORANDUM OPINION

Appeal from Johnson District Court; CHRISTINA DUNN GYLLENBORG, judge. Submitted without oral argument. Opinion filed March 28, 2025. Affirmed.

*Emily Brandt*, of Kansas Appellate Defender Office, for appellant.

*Tyler L. Childress*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before MALONE, P.J., SCHROEDER and CLINE, JJ.

PER CURIAM: Jasmine Lynell Harris appeals her conviction following a jury trial of one count of child abuse. Harris' only claim on appeal is that the State presented insufficient evidence to support her conviction. More specifically, Harris claims the evidence was insufficient to support a finding that she tortured or cruelly beat M.H., a minor child. After thoroughly reviewing the record, we find the evidence in the light most favorable to the State was sufficient to support the conviction. Thus, we affirm the district court's judgment.

1

FACTUAL AND PROCEDURAL BACKGROUND

In June 2021, the State charged Harris with one count of child abuse after M.H., age 9, reported to a school nurse and counselor that Harris had beaten her with an extension or power cord on March 4, 2021. The case proceeded to a jury trial on May 2, 2023. The State called Bailey Holman, a pediatric nurse practitioner at Children's Mercy Hospital, as its first witness. Holman saw M.H. on March 9, 2021, after M.H.'s grandmother brought her in to receive treatment. Holman took photographs of M.H.'s injuries that were admitted into evidence and viewed by the jury. The State walked Holman through the photographs, and she described how they showed scabbed over lacerations and bruising. Holman agreed that M.H. reported she was not in any pain that day. M.H. was allowed to take ibuprofen, and Holman provided no further treatment.

Allison Wiles, the nurse at M.H.'s elementary school, testified next and gave a more detailed account of what happened. Wiles' office was near the main office's reception desk. On the morning of March 8, 2021, she noticed M.H. walk into the main office and ask the receptionist if her grandmother had called. M.H. appeared "worried and upset." Wiles and a receptionist sent M.H. back to class. About an hour later, M.H. returned to the office and again asked if her grandmother had called. Wiles asked if M.H. was okay and if she had anything she wanted to talk to Wiles and the school counselor, Nicole Lobell, about, and M.H. affirmed that she did.

In Lobell's office, M.H. said that Harris had "whipped her with an extension cord over the weekend." M.H. pulled up her sleeve to show a mark that Wiles thought matched M.H.'s description of the incident. Wiles took M.H. back to her office so she could assess M.H.'s injuries. M.H. complained of physical marks on her legs that "were hurting really bad" because her pants were pressing tight against them. Wiles took several photographs of the injuries that were admitted into evidence and viewed by the jury. Wiles described each photograph, explaining how they showed dark brown scabs with

2

bruising around them on M.H.'s arms and two distinct lines of bruising on her leg. Wiles wrapped the leg in a bandage and sent M.H. back to class. Wiles and Lobell notified the school principal, the police, and the Kansas Department for Children and Families (DCF). Wiles agreed that M.H. was not limping, wincing, leaning on anything, and had no mobility issues. Wiles provided no treatment other than wrapping M.H.'s leg with a bandage.

Lobell testified that M.H. came into her office with Wiles and was "kind of worked up" and anxious. M.H. eventually explained that she had been in trouble at home for lying, and Harris struck her with an extension cord as punishment. M.H. shared with Lobell and Wiles that there were physical marks on her arms and legs from the extension cord. M.H. told Lobell that Harris had kept her home from school the previous Friday because Harris did not want the school to know about the marks.

Megan Maresh, the school principal, testified she got involved with the situation after Wiles and Lobell disclosed that a student had "pretty significant marks" and was saying "[Harris] had done it." Maresh confirmed that M.H. was present at school on Thursday, March 4, 2021, but absent on Friday, March 5, 2021. Maresh was present when someone from DCF and the police interviewed M.H. about the incident.

Nicole Riddle, a child protection specialist with DCF, testified that she was dispatched to the school in response to M.H.'s report. Riddle described how she conducted the "minimal facts interview" with M.H. M.H. told Riddle that on Thursday, March 4, 2021, she was at home and spilled vinegar. She also ate Harris' chips, drank her juice, and then lied about doing so. In response, Harris chased M.H. around the home while hitting her with an extension cord. Harris was yelling at M.H. while chasing her, "calling her a bitch, telling her to clean this shit up, [and] calling her a ho." M.H. told Riddle that she thought Harris was going to kill her.

3

M.H. described to Riddle that after the incident it was difficult for her to shower and get into bed. She could only put half her body in the shower because it hurt for water to touch her injuries. M.H. said she stayed home from school the following day because Harris wanted no one to see her injuries. M.H. described being struck with the extension cord six times. M.H. disclosed that she told her grandmother what happened over the weekend and that her grandmother told her to tell the school so M.H. could receive help. While Riddle conducted the interview, she could tell that M.H. was hurting and was in "some pain." After conducting the minimal facts interview, Riddle referred M.H. for a forensic interview conducted at Sunflower House.

Belinda Foster, M.H.'s grandmother, testified that on Sunday, March 7, 2021, M.H. and Harris visited Foster's house where M.H. disclosed to Foster that she had been in trouble for drinking or spilling juice. M.H. told Foster that "she got a whooping." M.H. showed Foster a welt on her arm and asked Foster to talk to Harris. But M.H. later changed her mind and asked Foster not to talk to Harris so she would not get into more trouble. On March 8, 2021, the day M.H. disclosed her injuries to Wiles and Lobell, Foster picked up M.H. from the school. She took M.H. to Children's Mercy Hospital the next day and helped get her to the Sunflower House for a forensic interview.

M.H. testified that she was up late on March 4, 2021, when she wanted a snack from the kitchen. While trying to get something to drink, she spilled some vinegar, tried to clean it up but did not completely do so, and then took a drink of Harris' apple juice. M.H. returned to her room with some cereal when sometime later Harris called her out of the room. Harris questioned M.H. whether she had spilled the vinegar and drank her juice, and M.H. at first said she had not. Harris responded that she would get her belt, and M.H. started crying. But Harris returned with an extension cord folded in her hand. Harris chased M.H. around the living room before M.H. ran into her room and locked the door. Harris yelled at M.H. to open the door, and M.H. complied because she was scared. When M.H. opened the door, Harris swung the extension cord at M.H. and struck her

4

several times. Harris eventually stopped hitting M.H. and yelled for her to clean the cereal that had spilled and to take a shower or bath. M.H. tried to shower but could not put her entire body in the water because it hurt to do so. She did not sleep well that night because the bedsheets stuck to her injuries and made them hurt.

The next day, Friday, March 5, 2021, M.H. did not go to school because Harris did not want people at school to see the injuries. M.H. described being hit hard seven or eight times. She also described going to Foster's house and telling Foster what happened. She confirmed that she asked Foster to talk to Harris but then changed her mind. She recalled talking to Wiles, Lobell, Maresh, a detective, and somebody from DCF, and confirmed that what she told them was accurate as she remembered it at the time. M.H. described her injuries as bloody the first day, then the next day they became black and red as they hardened. Her injuries were "pretty painful" to her.

Brian Eckstein, a detective with the Overland Park Police Department, testified. After the school had contacted the police, Eckstein was instructed to respond and assist with the investigation. Eckstein was present for the minimal facts interview conducted by Riddle, and he recalled that M.H. said she was struck with a power cord on March 4, 2021. Eckstein described cuts on M.H.'s upper left arm and marks on her right thigh. Eckstein also observed the Sunflower House interview. From that interview he learned that the incident occurred at M.H.'s house, and it happened because M.H. spilled some vinegar, drank Harris' juice, ate some of her chips, and then lied about it. Harris then looked for a belt but returned with what Eckstein described as a power cord or charger cord. Harris struck M.H. several times while calling her a "bitch and some other names."

The State's final witness was Erin Miller-Weiss, a forensic interviewer at Sunflower House. Miller-Weiss interviewed M.H. on March 16, 2021. M.H. told Miller-Weiss that Harris "whooped her," with an iPhone charging cord in a manner that left scars on her body. Harris held the ends of the cord in her hand and hit M.H. with the

5

looped center. M.H. disclosed that she spilled apple cider vinegar, drank Harris' juice, and spilled cereal, then lied about it as the reason Harris attacked her with the cord. Harris called M.H. names like "bitch and ho" and said things like, "Stop playing with me little bitch, quit fucking lying to me." M.H. told Miller-Weiss that she thought Harris wanted to kill her. While being hit, M.H. told Harris, "Please don't kill me."

At the forensic interview, M.H. was still feeling tender where she was struck on the inner thigh. She declined to put pressure on that area during the interview because it was still painful. M.H. described to Miller-Weiss that she tried to shower after the incident but could not wash her entire body and that the injuries hindered her ability to sleep. The morning after the incident, M.H. found it hard to walk. M.H. described how Harris kept her home from school the next day so others would not see her injuries.

At the close of the State's evidence, Harris moved for judgment of acquittal on the ground that the State failed to present sufficient evidence to satisfy the element of torture or a cruel beating. After hearing argument, the district court denied the motion.

Harris waived her right to testify, and she presented no evidence in her defense. Harris requested and the district court instructed the jury on parental discipline as a defense. Under this instruction, "[i]t is a defense to the charge of abuse of a child if a parent's use of physical force upon a child was reasonable and appropriate, and with the purpose of safeguarding the child's welfare or maintaining discipline." In closing argument, defense counsel maintained that the State's evidence failed to show that Harris tortured or cruelly beat M.H., an element of the crime charged. After hearing closing arguments, the jury deliberated and found Harris guilty as charged. The district court denied Harris' departure motion and sentenced her to 36 months' imprisonment with 24 months' postrelease supervision. Harris timely appealed the district court's judgment.

ANALYSIS

Harris' sole claim on appeal is that the State presented insufficient evidence to support her conviction because insufficient evidence supported a finding that her conduct amounted to torture or a cruel beating. The State asserts there was sufficient evidence for the jury to convict Harris of child abuse for torturing or cruelly beating M.H.

"'When the sufficiency of the evidence is challenged in a criminal case, we review the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. An appellate court does not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses.'" *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021).

The State charged Harris with child abuse under K.S.A. 2020 Supp. 21-5602(a)(1), which provides that "(a) Abuse of a child is knowingly:  Torturing or cruelly beating a child under the age of 18 years." The Kansas Supreme Court has defined "torture" in the context of child abuse as "'[t]o inflict intense pain to body or mind for purposes of punishment.'" *State v. Bruce*, 255 Kan. 388, 394, 874 P.2d 1165 (1994). The Supreme Court has defined "cruel" in the context of child abuse as "'pitiless or designed to inflict a high degree of pain, utter indifference to, or enjoyment of the suffering of others.'" *State v. Wilson*, 41 Kan. App. 2d 37, 40, 200 P.3d 1283 (2008) (quoting *State v. Lessley*, 271 Kan. 780, Syl. ¶ 4, 26 P.3d 620 [2001]).

Harris suggests this court adopt a new brightline rule:  "that eight or fewer strikes with an object to discipline a child for lying does not reach the level of torture or cruelly beaten." She argues that because M.H. did not need emergency medical care, was not deprived of necessities, did not suffer broken bones, did not die, and could not define exactly how long the beating lasted, the beating must not have reached the level of torture or a cruel beating. To support that proposition, Harris cites briefly to several cases to demonstrate the abusive conduct and injuries in those cases were more severe than the

injuries M.H. sustained. Thus, Harris suggests that the evidence of her conduct and M.H.'s less severe injuries falls short of the torture or cruel beating standard.

In *State v. Lucus*, 243 Kan. 462, 477, 759 P.2d 90 (1988), the evidence was sufficient to support a conviction for child abuse where it showed Lucus had pinched the victim's nipples so fiercely she could not be consoled, whipped her so severely that she had bruises on her legs and back that remained visible for over a week, and placed her in an unheated room without clothing, food, or drink for several hours. In *State v. Hupp*, 248 Kan. 644, 652, 809 P.2d 1207 (1991), circumstantial evidence showed that Hupp either struck or dropped an infant with enough force to cause a fatal head injury. In *State v. Henderson*, 32 Kan. App. 2d 1202, 1203, 96 P.3d 680 (2004), the court found sufficient evidence to support a child abuse conviction where doctors found 15 total bone fractures on the child. In *Wilson*, 41 Kan App. 2d at 41, the evidence was sufficient where it showed Wilson locked the children in makeshift enclosures while denying access to the restroom, baths, and clean clothes that fit while nearly starving them. In *State v. Money*, No. 124,268, 2023 WL 3143651, at *2, *9 (Kan. App. 2023) (unpublished opinion), the evidence was sufficient for a child abuse conviction where it showed Money had tied a child with electrical tape and hit him with a board more than 20 times for two hours. Finally, in *State v. Clark*, No. 124,497, 2023 WL 2618969, at *7-10 (Kan. App. 2023) (unpublished opinion), the evidence was sufficient to support findings of torture and a beating for child abuse where it showed Clark had grabbed two children by the neck and thrown them to the ground, and then slapped and bit one of the children.

Harris does not address how the facts in her case compare to each of these cases, nor does she elaborate or compare what evidence was sufficient or insufficient in the cases. Instead, she generally concludes that because M.H. suffered injuries less severe than broken bones or an injury requiring emergency care, the evidence did not support a finding that she tortured or cruelly beat M.H. In the same vein, she argues that because

evidence did not show she deprived M.H. of basic needs, kill M.H., or beat M.H. for an extended period, her conduct cannot rise to the level of torture or abuse.

The State asserts that Harris' case is most similar to *Clark*. The State points out that the lacerations sustained by M.H. caused more severe physical injury than the "marks, scratches, and bruising" in *Clark*, 2023 WL 2618969, at *2. When considering the court's analysis and its finding there was sufficient evidence to sustain the child abuse conviction in *Clark*, the State argues it is clear there was sufficient evidence here.

The State also points out the evidence showed that Harris inflicted intense emotional harm to M.H. Riddle testified that M.H. described she was scared and told Riddle she thought her mother was going to kill her. M.H. described Harris as yelling at her, including calling her names like "'bitch'" and "'ho.'" Miller-Weiss testified that M.H. said to Harris "'[p]lease don't kill me'" because she thought in that moment Harris wanted to kill her. The State maintains that based on this evidence a rational fact-finder could easily determine the beating was torture and cruel towards M.H.

We have no difficulty finding the evidence supported Harris' conviction of child abuse. Turning first to torture, the evidence shows that Harris inflicted intense bodily pain that prohibited M.H. from showering, sleeping, and sitting comfortably in class even several days later. The evidence also supported a finding that Harris inflicted intense pain for the purpose of punishment. M.H., and several other witnesses, testified that Harris struck M.H. in retaliation for M.H. spilling vinegar, eating Harris' food, drinking her apple juice, and then lying about doing so. Thus, in the light most favorable to the State, sufficient evidence supported the jury's finding that Harris inflicted intense pain on M.H. for the purpose of punishment—the definition of torture in *Bruce*, 255 Kan. at 394.

Turning to the definition of "cruel," the State needed to show that Harris' beating of M.H. was "'pitiless or designed to inflict a high degree of pain, [or with] utter

9

indifference to, or enjoyment of the suffering of others.'" *Wilson*, 41 Kan. App. 2d at 40. M.H. testified that Harris went searching for a belt to use to hit her before returning with the cord. M.H. stated that Harris hit her many times while M.H. feared for her life and asked Harris not to kill her. While striking M.H., the evidence showed that Harris yelled derogatory profanities at her. This evidence supports a finding that Harris acted in a fit of rage which further shows her strikes were pitiless or designed to inflict a high degree of pain, and that she did so with utter indifference to M.H.'s suffering. The evidence in the light most favorable to the State supported a finding that Harris cruelly beat M.H.

Finally, Harris argues that "the State had to disprove that [Harris'] use of force was unreasonable and not for the purpose of maintaining discipline. Evidence at trial tended to show that [Harris'] actions were in response to [M.H.'s] lying." We presume Harris is referring to the jury instruction on the parental discipline defense she requested and received at trial. Whether parental discipline is a valid defense to a child abuse charge is not an issue before us. The district court instructed the jury on the defense and told the jury it should consider the evidence supporting the defense in determining whether Harris was guilty of child abuse. The jury considered Harris' parental discipline defense and rejected it. We do not reweigh the evidence on appeal. *Aguirre*, 313 Kan. at 209.

In sum, Harris' arguments are not persuasive. She ignores that while Kansas courts may have heard factually different or more severe cases, the cases that she cites to do not foreclose all other forms of child abuse. The State presented ample evidence that could lead a rational jury to conclude beyond a reasonable doubt that Harris tortured or cruelly beat M.H. by whipping her with a cord. We conclude there was sufficient evidence in the light most favorable to the State to support Harris' conviction of child abuse.

Affirmed.